**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:24 CR-00287-O |
| | § | |
| NATHAN REIS and | § | (01) |
| STEPHANIE HOCKRIDGE, a/k/a | § | (02) |
| STEPHANIE REIS, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
<u>JOINT OPPOSED MOTION TO DISMISS COUNT ONE OF THE INDICTMENT</u>**

1

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ 3

SUMMARY AND INTRODUCTION ................................................................................ 4

DISCUSSION .................................................................................................................... 8

  I.    Count One of the Indictment Alleges at Least Two Separate Conspiracies Concerning Separate Phases of the PPP Program ................................................... 8

    A.    Count One Alleges an Initial, Narrow Conspiracy from April to August 2020, During the PPP Program's Initial Phases ............................................ 9

    B.    Count One Also Duplicitously Describes a Second Conspiracy That Aligns with PPP Phase 3........................................................................................... 10

    C.    A Count Is Subject to Dismissal for Duplicity When It Charges More Than One Crime, Including More Than One Conspiracy ................................................. 12

    D.    Count One Alleges (at Least) Two Conspiracies and Is Therefore Duplicitous .......... 15

      1.    The Two Conspiracies Alleged in Count One Occurred at Different Times ........... 16

      2.    The Two Conspiracies Alleged in Count One Had Different Objects ..................... 16

      3.    The Two Conspiracies Alleged in Count One Are Alleged to Have Employed Distinct Manners and Means ........................................................ 16

      4.    The Two Conspiracies Alleged in Count I Are Alleged to Have Involved Different Participants ............................................................... 17

      5.    The Scale of the Two Conspiracies Alleged in Count One Is Markedly Different ............................................................................... 18

      6.    The Anticipated Proof Regarding Each Alleged Conspiracy Differs Drastically ... 18

  II.    In Light of Its Duplicity, This Court Must Dismiss Count One of the Indictment .......... 20

CONCLUSION ................................................................................................................ 21

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Brooks v. United States*,
    164 F.2d 142 (5th Cir. 1947) .................................................................. 11
*Kotteakos v. United States*,
    328 U.S. 750 (1946) ....................................................................... Passim
*United States v. Adan*,
    913 F. Supp. 2d 555 (D. Tenn. 2012) .................................................. 13
*United States v. Elliot*,
    571 F.2d 880 (5th Cir. 1978) .............................................................. 12
*United States v. Fahra*,
    643 F. App'x 480 (6th Cir. 2016) ....................................................... 12
*United States v. Guerra-Marez*,
    928 F.2d 665 (5th Cir. 1991) .............................................................. 12
*United States v. Gunselman*,
    643 F. App'x 348 (5th Cir. 2016) ....................................................... 19
*United States v. Hinton*,
    127 F. Supp. 2d 548 (D.N.J. 2000) ................................................ 10, 19
*United States v. Sapyta*,
    390 F. Supp. 2d 563 (W.D. Tex. 2005) .......................................... 10, 19
*United States v. Starks*,
    515 F.2d 112 (3d Cir. 1975) ......................................................... 11, 19
*United States v. Swafford*,
    512 F.3d 833 (6th Cir. 2008) ........................................................ 11, 12
*Unites States v. Jones*,
    733 F. 3d 574 (5th Cir. 2013) ............................................................ 12

**Rules**

Fed. R. Crim. P. 12(b)(3)(B)(i) ................................................................. 10
Federal Rule of Evidence 801 .................................................................... 20

### SUMMARY AND INTRODUCTION

During the Phase 1 and PPP programs that lasted from April 3, 2020, through August 8, 2020, the Defendants (principally Mr. Reis) are alleged to have worked directly with four borrowers to assist them in putting together loan applications that contained false information. During the Phase 3 PPP program, which lasted from January 12, 2021, through May 31, 2021, the Defendants' company took on a new role as a lender service provider to two different banks, earning fees not from borrowers, but from the lenders themselves. Also as a part of that latter phase of PPP fund distribution, Ms. Hockridge created a program called "VIPPP," which gave personalized service to certain individuals in applying for loans by identifying and recruiting referral agents to identify borrowers in need of assistance. Through their company's lender service provider business model and the VIPPP program, the Defendants helped hundreds of thousands of eligible borrowers gain access to PPP funds.

On August 8, 2020, Phase 2 of the Paycheck Protection Program (PPP), established by the CARES Act, came to a close. At that point, by definition, any conspiracy that the Defendants are alleged to have engaged in had ended. Prior to that time, the Defendants are alleged to have worked directly with borrowers to assist them with preparing their PPP loan applications. But as of August 8, 2020, there were no more applications to submit, no more loans to be funded, and no indication as to whether or when any additional PPP funds would be made available. To the extent that the Defendants received payments for their work, they received them by the end of that time period. Thus, if there had been a conspiracy as the Indictment alleges, its objects would have been achieved (or not), and all of the alleged coconspirators would have exited whatever conspiracy they were engaged in. In short, whatever conspiracy the Defendants might have allegedly participated up until that time came to an end, at the latest, on August 8, 2020.

4

It was not until months later, on January 11, 2021, that Phase 3 of the PPP program began as established and governed by the Economic Aid Act, which set forth new guidelines and processes for obtaining new government-backed loans. According to the Indictment, it was in the lead up to that program that the Defendants "expanded [their] operations through . . . lender service provider agreement[s]" they entered into in October 2020 and April 2021. However, the Defendants did not simply "expand" their operations; they started entirely new companies organized or incorporated in various states including Wyoming, Arizona, and Delaware. Defendants managed operations across several entities and acted on behalf of multiple **lenders** to originate, process, service, and submit loan applications to the SBA from qualified PPP applicants. Under the lender service provider agreements described in the indictment, Defendants' company was now entitled to receive payments from **lenders** for processing borrower applications. The Defendants are also alleged during this time period to have created a program known as the "VIPPP" program (which did **not** exist during the earlier phases of the PPP program) whereby borrowers were offered a "personalized service" and dedicated support to help navigate the brand new and often daunting PPP loan submission process. *See* Indictment (Doc. #3) 18(e).

Despite Phase 2 and 3 of the PPP program being separated in both time and nature—as well as rapidly evolving conditions and changing regulations and guidance in the midst of a global pandemic—the Government has attempted to lump together the Defendants' alleged conduct during those two disparate phases into a single conspiracy in order to artificially reduce its burden of proof. Doing so is not only improper as a technical matter of pleading—here, it also carries the very real risk that the jury could return a nonunanimous verdict regarding supposed criminal conduct regarding two separate and distinct government programs. And not only are the manner and means of each of those two alleged conspiracies alleged to be different in the Indictment itself,

but the nature of the allegations against the two defendants in each conspiracy are fundamentally distinct as well.

In the first conspiracy, **_Mr. Reis_** is alleged to have directly provided advice and encouragement to three specific borrowers who submitted loan applications containing purportedly false information, without any specific allegation of what knowledge or involvement Ms. Hockridge had with respect to any falsehoods in any of their applications. In the second conspiracy, by the Government's telling, **_Ms. Hockridge_** was allegedly the prime mover, being principally in charge of the VIPPP Program, a separate program that provided a "personalized service" to loan applicants in exchange for a fee, and which, according to the Indictment, involved the recruitment of "conspirators to work as VIPPP referral agents and coach borrowers on how to submit false PPP loan application." Indictment Doc. (#3) ¶ 18(e).[1] Mr. Reis is not specified as having performed any acts in furtherance of the alleged VIPPP Program fraud and, as the evidence will show, he had little to no involvement in that program. Instead, Mr. Reis was focused at that time on scaling Blueacorn's broader business, which ultimately helped hundreds of thousands of borrowers gain access to desperately needed funding in the midst of nationwide shutdowns and unprecedented economic uncertainty. And for the overwhelming majority of the loans processed by Blueacorn during that latter time period, the Government does not allege any fraud by the Defendants whatsoever.

The nature of the Government's evidence in each of the two conspiracies alleged in Count One is also markedly different. In the first conspiracy, the Government evidently intends to introduce evidence of specific communications between borrowers and Mr. Reis (not Ms.

---

[1]    Unless otherwise indicated, all paragraph references (¶) contained herein refer to the paragraphs of the Indictment (Doc. #3).

Hockridge) that had allegedly put him on notice of the falsity of certain representations made by those borrowers. In the second conspiracy, the Government evidently intends to introduce evidence that Ms. Hockridge conspired with a new individual, Eric Karnezis, who was not involved in the first alleged conspiracy, to submit fraudulent loan applications through the VIPPP program, although the Government does not allege that either Defendant had actual knowledge of the falsity of any application submitted by borrowers working with Mr. Karnezis.[2] In the first conspiracy, the Indictment identifies only a few allegedly fraudulent loans, with a combined principal of *less than $500,000*. In the second conspiracy, the Government has identified more than *400* loans it claims were fraudulently submitted through the VIPPP program, with a total loan principal *exceeding $60 million* (more than 100 times the principal of the loans the Indictment alleges as part of the first conspiracy). Thus, the two conspiracies alleged in Count One are markedly different in terms of their alleged timeframe, objects, manner, means, scale, participants, and proof.

Mr. Reis and Ms. Hockridge are husband and wife. But that does not make them jointly and severally liable for one another's alleged criminal activity. If Count One is permitted to be tried as a single count, there is a genuine risk that the jury might be invited to convict both defendants without reaching unanimity as to which of the two distinct conspiracies each defendant participated in (or whether either conspiracy existed in the first place). This Court must therefore dismiss Count One for improperly lumping together the alleged conspiracy during the first two phases of the PPP, which could have ended no later than August 8, 2020, and the separate

---

[2]    Notably, Mr. Karnezis has recently pled guilty in a separate case out of the District or Oregon for his role in a conspiracy with others to submit fraudulent loans, after he confessed to the Government that he submitted knowingly false information for potentially hundreds of borrowers, a fact he deliberately concealed from Ms. Hockridge and the VIPPP team.

conspiracy alleged to have occurred during the PPP program's third phase, which did not begin until January 12, 2021.

DISCUSSION

**I.     Count One of the Indictment Alleges at Least Two Separate Conspiracies Concerning Separate Phases of the PPP Program**

The Indictment's Count One purports to allege a single conspiracy to submit, and cause the submission of, false and fraudulent applications for PPP loans. Indictment (Doc. #3) ¶ 16. But as outlined above, the allegations in the Indictment in fact describe multiple conspiracies, rendering Count One impermissibly duplicitous. One alleged conspiracy occurred during Phases 1 and 2 of the PPP program, which ran from April to August 2020. *See* **Ex. A** (U.S. Government Accountability Office, "Paycheck Protection Program: Program Changes Increased Lending to the Smallest Businesses and in Underserved Locations" (Sep. 21, 2021)) (describing three phases of the PPP program). During that conspiracy, Mr. Reis allegedly acted as a consultant to ***borrowers***, assisting individuals and businesses applying for PPP loans. Indictment (Doc. #3) ¶ 18(a)–(c). Because the PPP program stopped issuing loans to borrowers on August 8, 2020, any alleged conspiracy relating to that program necessarily concluded on or before that date.

The second conspiracy is alleged to have begun in or around October 2020 and continued into 2021, aligning with PPP Phase 3, which created a new process for compensating lenders to incentivize lending to smaller borrowers. *Id.* ¶ 18(d)–(e). During that second conspiracy, Defendants and unnamed "others" allegedly signed new contracts with ***lenders*** to facilitate PPP loan applications, developed a new system for helping borrowers apply for loans online, and developed a new VIPPP program to help borrowers obtain PPP loans. *See id.*

Allowing the Government to pursue the two separate conspiracies described in the Indictment under a single count at trial will unfairly prejudice Defendants. Among other problems,

8

the Government's attempt to conflate two separate programs that existed in two distinct time periods poses the "danger[] of transference of guilt from one to another across the lines separating conspiracies, subconsciously or otherwise." *Kotteakos v. United States*, 328 U.S. 750, 774 (1946). Defendants therefore respectfully request that the Court dismiss Count One of the Indictment.

### A. Count One Alleges an Initial, Narrow Conspiracy from April to August 2020, During the PPP Program's Initial Phases

The Indictment identifies an alleged conspiracy that began in April 2020, when the first phase of the PPP program began, and continued through the second phase of PPP (which continued from April 27 to August 8, 2020). *See* **Ex. A** (describing PPP program phases). That alleged conspiracy was extremely limited: it allegedly involved submitting applications for PPP loans only for the Defendants and four acquaintances the Indictment describes as coconspirators—not vast swaths of the borrowing public. Indictment ¶ 18(a) ("Beginning in or around April 2020, Reis, Hockridge, and their coconspirators began submitting fraudulent applications for PPP loans for themselves and their businesses."); *see id.* ¶¶ 18(a)–(c), 19(a)–(c), (e)–(h).

More specifically, in this first, limited conspiracy, the Indictment alleges fraudulent acts by only Mr. Reis and Ms. Hockridge in submissions for Juuice Inc. and Body Politix LLC, two businesses owned by them separately. Indictment (Doc. #3) ¶¶ 19(a)–(d). The Indictment then alleges fraudulent acts by Mr. Reis, Mr. Flores, and Mr. Cota (***not*** Ms. Hockridge) in a single submission for Mr. Flores's sole proprietorship, ¶ 19(e); fraudulent acts by Mr. Reis and Mr. Cota (***not*** Ms. Hockridge) in a single submission for Mr. Cota's sole proprietorship, ¶ 19(f); fraudulent acts by Mr. Reis and Ms. Arriaga (***not*** Ms. Hockridge) in a single submission for Arriaga's sole proprietorship, ¶ 19(g), and fraudulent acts by Mr. Reis, Ms. Hockridge, and Mr. Hochberg in a single submission based on Mr. Hochberg's sole proprietorship, ¶ 19(h).

9

It is not clear from the way even this first conspiracy is alleged that there are not separate conspiracies contained within this conspiracy, most of which are not even alleged to have anything to do with Ms. Hockridge. For example, according to the Indictment, it is only Mr. Reis who allegedly conspired with Mr. Flores and Mr. Cota on Mr. Flores's application, ¶ 19(e), only Mr. Reis who allegedly conspired with Mr. Cota on Mr. Cota's application, ¶ 19(f); and only Mr. Reis who allegedly conspired with Ms. Arriaga on Ms. Arriaga's application, ¶ 19(g). And although there is a general allegation that Ms. Hockridge participated with Mr. Reis in conspiring with Coconspirator-2 for his application for a non-existent business, only Mr. Reis and Coconspirator-2 are identified as actually taking an act in furtherance for that application. *See* Indictment (Doc. #3) ¶ 19(h).

All of the acts described above are alleged to have occurred between April and August of 2020, and for good reason—as of August 8, 2020, the second phase of PPP had ended, and any object of the alleged conspiracy therefore had either been achieved, or not.

### B. Count One Also Duplicitously Describes a Second Conspiracy That Aligns with PPP Phase 3

But Count One's allegations also embrace an alleged conspiracy in connection with an entirely separate phase of the PPP program established by an entirely different federal law, which was passed on December 27, 2020, that created an opportunity for borrowers a new round of PPP funding starting in January 2021. "Phase 3" differed in significant respects from the two initial phases of the PPP—as did the alleged manner and means of any alleged conspiracy with respect to that third phase of the program. Importantly, during the first two PPP phases described above, lenders earned fees based on a percentage of the loan amount. *See* **Ex. B** (SBA Procedural Notice re: "Second Updated Paycheck Protection Program Lender Processing Fee Payment and 1502

Reporting Process," (Feb. 8, 2021)). As a result, lenders were incentivized to focus primarily on large loans, to the unfortunate exclusion of loans for many of the country's small businesses.

Recognizing that perverse incentive and seeing that many small businesses were unable to obtain loans during Phases 1 and 2 of the PPP, the SBA revised the program and created a new Phase 3, which lasted from January 12, 2021, through June 30, 2021. *See* **Ex. B**. In light of many small businesses' inability to obtain loans in Phases 1 and 2 of the PPP due to flawed incentives, Congress, with the help of the SBA, overhauled the program by passing the Economic Aid Act, which launched Phase 3 of the PPP from January 12, 2021 to (effectively) June 30, 2021. The SBA issued new regulations under which lenders were entitled to a minimum fee regardless of the size of the loan for processing loan applications, thus incentivizing banks to prioritize making loans to smaller borrowers. *See* **Ex. B**.

As described in the Indictment, after learning of the new regulations that would be applicable to PPP Phase 3, Defendants each took new and unprecedented steps to help meet the long-underprioritized demand for loans among smaller, potentially less sophisticated borrowers. Mr. Reis developed a financial technology platform to not only originate loans, but also to scale operations, which helped lenders process PPP applications within the narrow two-and-a-half month window set by Congress. Defendants created a new lender-service-provider business model that provided a straightforward, on-line application process for potential borrowers to use in obtaining loans, at no cost to the borrower. *See* Indictment (Doc. #3) ¶ 18(d).

Although the Government identifies the development of Blueacorn's new lender-service-provider business model as among the "manner and means" of the (second) alleged conspiracy, the Government has not made any allegation that any actions the Defendants took in developing the new business model were fraudulent in any respect. Indeed, as the evidence will show,

Blueacorn processed more than 750,000 applications for small businesses and others through its lender-service-provider platform, and the Indictment only identifies *six* borrowers that the Government even claims were known by Defendants to have submitted fraudulent applications.[3]

Also during PPP Phase 3, Ms. Hockridge separately created the "VIPPP" program to provide additional assistance to certain individuals and businesses who sought more personalized service in connection with preparing their loan applications. *See* Indictment (Doc. #3) ¶ 18(e). As part of that program, Count One alleges that Ms. Hockridge and Mr. Reis recruited others "to work as VIPPP referral agents" (which Ms. Hockridge readily admits) and to "coach borrowers on how to submit false PPP loan applications" (which she categorically denies). *Id.*

### C. A Count Is Subject to Dismissal for Duplicity When It Charges More Than One Crime, Including More Than One Conspiracy

"An indictment is duplicitous when two separate offenses are charged in a single count." *United States v. Sapyta*, 390 F. Supp. 2d 563, 566 (W.D. Tex. 2005); Fed. R. Crim. P. 12(b)(3)(B)(i). A duplicitous indictment "compromises a defendant's Sixth Amendment right to know the charges against him." *United States v. Hinton*, 127 F. Supp. 2d 548, 553 (D.N.J. 2000). But more than merely posing notice problems for a defendant, duplicity risks injecting ambiguity into a jury's verdict, not to mention the danger of a nonunanimous verdict. A general verdict against the defendant on one count that contains more than one crime "does not reveal whether the jury found him guilty of one crime[,] or not guilty [or guilty] of both"; as a result, the verdict will not show whether the jury was unanimous as to two crimes contained in the single count. *United States v. Starks*, 515 F.2d 112, 116 (3d Cir. 1975).

---

[3]    The Defendants are even not alleged to have had actual knowledge that the loan applications alleged to be fraudulently submitted by Eric Karnezis through VIPPP borrowers were false.

An indictment that combines multiple *conspiracies* into one count is likewise duplicitous—and duplicity on a conspiracy charge poses even greater dangers. *See generally Kotteakos*, 328 U.S. at 774 (explaining that lumping multiple conspiracies into one count violates the requirement for "separate statement[s] in different counts of related but distinct 'acts or transactions of the same class of crimes or offenses'"); *cf. Brooks v. United States*, 164 F.2d 142, 143 (5th Cir. 1947) (holding that a trial "was conducted too much . . . on the assumption that it was immaterial whether the proof showed one conspiracy with which all of the defendants were connected, or separate conspiracies with which some, but not all, of them were" (citation omitted)). Allowing the Government to proceed on an erroneous single-conspiracy theory when the Indictment actually alleges multiple conspiracies risks "imput[ing] to each defendant the acts and statements of the others" (and of other supposed coconspirators) "without reference to whether they related to one of the schemes proven or another, and to find an overt act affecting all in conduct which admittedly could have affected only some." *Kotteakos*, 328 U.S. at 771; *cf. United States v. Swafford*, 512 F.3d 833, 843 (6th Cir. 2008) ("[I]nstead of having to prove each of the multiple conspiracies, which was necessary due to the failure to demonstrate a single conspiracy, the government offered evidence only as to the alleged single enterprise. Consequently, the jury could simply seize upon the most significant [inculpatory transactions] . . . and the most suspicious behavior exhibited by [the defendant] and then apply the evidence against the defendant vis-à-vis each of the alleged co-conspirators."); *cf. Brooks*, 164 F.2d at 143 (holding that, when the government charges a single conspiracy, "due process as to each defendant require[s] for a conviction that the evidence be strong enough to exclude every other reasonable hypothesis than guilt of that defendant on the *precise conspiracy charged*" (emphasis added)).

In short, as the Supreme Court has held, the Indictment's duplicitous approach poses the "danger[] of transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise"—here, a defined temporal line based on the ***structure of the PPP programs themselves***, shaped by the PPP's own established framework. *Kotteakos*, 328 U.S. at 774; *see also United States v. Fahra*, 643 F. App'x 480, 493 (6th Cir. 2016) (recognizing that allowing the government to rely on evidence of multiple conspiracies with many conspirators, but assert only one conspiracy charge, may mislead "the jury into assuming a union of criminal intent, an agreement to cooperate, and an increase degree of culpability, thereby causing significant prejudice").

Multiple factors determine whether a course of conduct represents one, or rather multiple, conspiracies. An allegedly single conspiracy may in fact be two separate conspiracies if they occur at separate times, as well as if the "manner and means" of the conspiracies differ. *Fahra*, 643 F. App'x at 492–93 (holding that proving multiple conspiracies to support a single-conspiracy count is an impermissible variance). So too when the supposed conspirators do not share a single goal, are "not truly interdependent or where the various activities sought to be tied together cannot reasonably be said to constitute a unified scheme." *United States v. Elliot*, 571 F.2d 880, 901 (5th Cir. 1978); *Swafford*, 512 F.3d at 842 ("The government failed to prove that the methamphetamine cooks were acting in furtherance of a common goal or that there was any significant interdependence among them."); *see generally Unites States v. Jones*, 733 F. 3d 574, 580–81 (5th Cir. 2013) (identifying factors for identifying multiple conspiracy for purposes of double jeopardy); *United States v. Guerra-Marez*, 928 F.2d 665, 671 (5th Cir. 1991) (holding that conspiracies were separate based on an analysis of common goals, nature of the schemes, and whether participants overlapped); *United States v. Adan*, 913 F. Supp. 2d 555, 565 (D. Tenn. 2012)

("[W]hile a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy does not know every other member, it is necessary to show that each alleged member agreed to participate in what he knew to be a collective venture directed to a common goal." (cleaned up)).

In *Kotteakos*, for example, the Government charged multiple defendants with one conspiracy to "induce various financial institutions to grant credit, with the intent that the loans or advances would then be offered to the Federal Housing Administration for insurance upon applications containing false and fraudulent information." 328 U.S. at 752. The alleged conspiracy was "executed through a common key figure, Simon Brown," who "undertook to act as a broker in placing for others loans for modernization and renovation, charging a five percent commission for his services." *Id.* at 752–53. He allegedly knew "when he obtained the loans, that the proceeds were not to be used for the purposes stated in the applications." *Id.* The Court held that alleged conduct represented "not . . . a single conspiracy, but . . . several, notwithstanding only one was charged in the indictment," explaining that "no connection was shown between" the alleged conspirators who had "transacted business with Brown relating to National Housing Act Loans," except that "Brown had been the instrument in each instance for obtaining the loans." *Id.* at 754–55.

### D.  Count One Alleges (at Least) Two Conspiracies and Is Therefore Duplicitous

As outlined above and detailed further below, Count One alleges at least two conspiracies in a single count and is thus duplicitous. Most problematically, it impermissibly melds together a conspiracy to obtain fraudulent loans during the first and second phases of the PPP program— which conspiracy, as a sheer matter of logic, cannot have continued past August 8, 2020, when those programs ended—and the third phase of the PPP program, which did not begin until more than four months after the second phase of the program had concluded. The disunity between the

two alleged conspiracies is apparent from their timeframe, objects, manner, means, participants, scale, and proof.

### 1. The Two Conspiracies Alleged in Count One Occurred at Different Times

The first conspiracy alleged in Count One occurred during PPP Phases 1 and 2, which stretched from April 3, 2020, through August 8, 2020. *See* **Ex. A** (describing PPP program phases) at 1; Indictment (Doc. #3) ¶¶ 18(a), 19(a)–(c), (e)–(h). The second conspiracy occurred thereafter, overlapping with PPP phase 3, when Congress passed a new to allow lenders to obtain a minimum fee regardless of the size of the loan, thus incentivizing loans to smaller borrowers. *See* **Ex. B** at 1 (explaining that lender fees for the smallest loans were the lesser of 50% of the loan or a $2,500 flat fee) at 1–2; Indictment (Doc. #3) ¶¶ 18(d)–(e).

### 2. The Two Conspiracies Alleged in Count One Had Different Objects

During the first conspiracy, the Defendants allegedly obtained fraudulent loans for themselves and four individuals (whom the Indictment identifies as co-conspirators) in order to obtain payments for their services directly from those ***borrowers***, who paid Mr. Reis (not Ms. Hockridge) for his consulting services. *E.g.*, Indictment (Doc. #3) ¶¶ 19(a), (b), (c), (e), (f), (g), (h). In the second conspiracy, Defendants and "others" are alleged to have committed fraud in order to collect fees paid by ***lenders*** for their work as lender service providers, as well as to collect fees from borrowers who participated in the VIPPP program. *Id.* ¶ 18(d)–(e).

### 3. The Two Conspiracies Alleged in Count One Are Alleged to Have Employed Distinct Manners and Means

As part of the first conspiracy alleged during PPP Phases 1 and 2, the Defendants (in most cases, Count One identifies Mr. Reis alone) and co-conspirators allegedly falsified or helped falsify loan-application documents for borrowers with whom they had direct contact. *See* Indictment (Doc. #3) ¶¶ 19(a)–(c), (e)–(h). As a result, the Defendants understand from their counsel's conferences

16

with the Government, the Government intends to prove that the Defendants had direct knowledge that the borrowers' representations were actually false.

In the second conspiracy during PPP Phase 3, by contrast, the Defendants are alleged to have worked with others at Blueacorn to "collect[] and review[] applications from potential borrowers" under lender service provider agreements. *Id.* ¶¶ 8, 18(d). Although the Indictment does not say so, it is undisputed that applications were sent to Blueacorn through an online portal. The Defendants almost never had any contact with borrowers who submitted their application directly through that portal and therefore would not have had actual knowledge of any false representations in such loans where they never had contact with the borrowers in question.

Separately as part of the second conspiracy, Ms. Hockridge is alleged to have operated the VIPPP program that "offered a personalized services to help potential borrowers complete PPP loan applications" and "recruited coconspirators to work as VIPPP referral agents and coach borrowers on how to submit false PPP loan applications." *Id.* ¶ 18(e). With regard to that aspect of the second conspiracy, the Government apparently contends that Ms. Hockridge was wilfully blind to borrowers' fraudulent applications, but not that she had actual knowledge as to the fraudulent nature of any particular loan application the alleged recruiters assisted applicants in submitting. (No similar allegations of recruitment or coaching of recruiters are alleged as part of the first conspiracy—nor could they be, since the VIPPP program did not even exist at the time of the first conspiracy.)

### 4. The Two Conspiracies Alleged in Count I Are Alleged to Have Involved Different Participants

In the first conspiracy, Mr. Reis was allegedly the prime mover. Indeed, Count One's allegations through August 2020 repeatedly focus primarily on him, to the exclusion of Ms. Hockridge: "Reis created," ¶ 19(a), "Reis submitted," ¶ 19(b), "Reis, Coconspirator-1, and Cota

submitted," ¶ 19(e), "Reis and Cota submitted," ¶ 19(f), "Reis helped submit," ¶ 19(g). And only the first conspiracy appears to involve Mr. Cota, Ms. Arriaga, and Coconspirator-1. *See id.* ¶¶ 19(e), (f), (g).

On the other hand, Count One (and, more explicitly, the Government's discussions with the undersigned) suggests that Ms. Hockridge was the prime mover in the second conspiracy, particularly the VIPPP program. *See id.* ¶ 18(e) ("Hockridge and others offered a personalized service to help potential borrowers . . . ."). Moreover, the second conspiracy alone involved Lender-2, as well as unspecified "others" and "referral agents." *Id.* ¶ 18(d)–(e),

### 5.  The Scale of the Two Conspiracies Alleged in Count One Is Markedly Different

The first conspiracy concerns Defendants (primarily Mr. Reis) and conspirators submitting allegedly fraudulent loan applications for themselves. The second conspiracy concerns a larger alleged enterprise: an arrangement with two lenders to help process borrower applications, and a VIPPP network of referral agents to help coach borrowers on applying for loans. In the first conspiracy, the total loan principal the Government contends was fraudulent was ***not even $500,000***; in the second conspiracy, the loans alleged to be fraudulent by the Government total to more than ***$60 million***. And in the first conspiracy, the Indictment identifies ***only six*** allegedly fraudulent loans; in the second, the Government has identified ***more than 400***.

### 6.  The Anticipated Proof Regarding Each Alleged Conspiracy Differs Drastically

With respect to the first conspiracy, the Government's anticipated proof is relatively straightforward: the Government evidently seeks to introduce written communications and witness testimony from particular borrowers, as well as financial records of the Defendants themselves, in an effort to establish that the Phase 1/2 loans alleged to be fraudulent were known by the Defendants (and primarily, Mr. Reis) to contain materially false information. Thus, the likely evidence presented by both parties with respect to the first conspiracy will likely focus on the

Defendants' direct knowledge (or lack thereof) of the truth or falsity of specific statements in a relatively small universe of loan applications.

The anticipated evidence with regard to the second conspiracy, however, bears little to no resemblance to the expected proof of the first conspiracy. With regard to the second conspiracy, the Government does not allege either Defendant had actual knowledge of the falsity of statements in any of the loan applications that were processed during Phase 3 of the PPP, but that they (or at least Ms. Hockridge) encouraged a single referral agent, Eric Karnezis, to falsify information in applications prepared on behalf of borrowers he was referring in order to allow them to obtain loans they would not otherwise qualify for. The conversations in question were not recorded or reproduced in writing; instead, whether they occurred or not depends almost entirely on the say-so of Mr. Karnezis. In other words, proof of the second conspiracy will rely almost entirely on uncorroborated witness testimony to establish whether any unlawful agreement ***even existed***. And importantly, Mr. Reis is not even alleged by the Government to have been a part of any such conversation. By alleging the two conspiracies as one, the Government hopes to impermissibly bootstrap the alleged criminal intent of the Defendants with respect loans they are alleged to have directly discussed with borrowers to shore up the unsubstantiated claims of Mr. Karnezis as to instructions allegedly given to him Ms. Hockridge (again, not Mr. Reis) during the second conspiracy.

While all of the distinctions detailed above demonstrate the critical difference between the two conspiracies duplicitously charged in Count One, the night-and-day distinction in the proof is perhaps the most pernicious. Ms. Hockridge is alleged to have had almost nothing to do with the first conspiracy, and Mr. Reis is alleged to have almost nothing to do with the second. Disproving the Government's allegations of the first conspiracy will simply require the Defendants to show

that they were not aware of any falsity in the applications they assisted others in submitting; in the second, such evidence would be no defense. Instead, to disprove the Government's allegations in the second conspiracy, the Defendants will have to persuade the jury that Mr. Karnezis's claims of having received direction from Ms. Hockridge on how to "coach" borrowers into submitting fraudulent applications are not to be believed.

The conflation of the two conspiracies alleged in Count One therefore has the potential to cause substantial prejudice to the Defendants and confusion for the jury. Imagine that Jurors 1 through 6 do not believe that either of the Defendants knew of any false information in any application submitted during the first conspiracy, but Jurors 7 through 12 do. Now imagine that Jurors 7 through 12 do not believe Mr. Karnezis's self-serving (and late coming) efforts to implicate Ms. Hockridge and think the Defendants did not know of any fraud in the VIPPP—but Jurors 1 through 6 find Mr. Karnezis's story to be credible. If the two conspiracies had been properly pled as separate counts, the jury would hang on each of them—but because of the Government's effort to lump to the two distinct phases of the PPP program together, the jury might nonetheless convict.

There are many more hypotheticals that could be invented, each more problematic than the last. Under any of them, the potential prejudice to the Defendants is extreme. But there is no prejudice to the Government whatsoever from requiring the jury to return separate verdicts on the two distinct conspiracies alleged in Counts One and Two, thereby ensuring that their verdict— whether to convict or to acquit—will be unanimous.

## II.   In Light of Its Duplicity, This Court Must Dismiss Count One of the Indictment

As explained above, the Government gravely erred by charging more than one conspiracy in Count One. Its decision to do so risks both a nonunanimous verdict as to which Defendant participated in which conspiracy, as well as the improper transference inferences of guilt across

the two distinct conspiracies. As a result, the duplicitous indictment warrants dismissing the offending count, thereby requiring the Government either to obtain a new indictment with the separate offenses charged separately, or to go to trial on the remaining counts of the Indictment. *See Sapyta*, 390 F. Supp. 2d at 566–67; *United States v. Gunselman*, 643 F. App'x 348, 353 (5th Cir. 2016); *Starks*, 515 F.2d at 118; *Hinton*, 127 F. Supp. 2d at 554. No remedy short of dismissal will be adequate to protect the Defendants from the unfair prejudice inherent in being tried on Count One, given its duplicity.

The Government may argue that, instead of providing the remedy required by the above-cited case law, the Court should instead simply provide a curative jury instruction at the end of trial. But a jury instruction will be too little, too late. By that time, the jury will have heard the Government's arguments and presentation of the evidence, all of which will have been organized to prove a single conspiracy. After hearing throughout trial that the Defendants engaged in one conspiracy, the jury will struggle, based on a late-breaking instruction layered on top of many other instructions, to avoid "transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise." *Kotteakos*, 328 U.S. at 774. Moreover, during trial the Government may attempt to introduce coconspirator statements against a Defendant under Federal Rule of Evidence 801 when the declarant was part of a separate conspiracy that did not involve that Defendant. For those reasons, a mere curative instruction will not be sufficient to ensure that the Defendants are not improperly forced to defend against a single charge that impermissibly seeks to blend two distinct conspiracies together.

## CONCLUSION

The Defendants deserve to be convicted or acquitted at trial based upon their own conduct. But by amalgamating at least two separate conspiracies, with different alleged participants,

different alleged objects, and different alleged means, each allegedly occurring at different times under different program rules and regulations, the Government risks obtaining an ambiguous verdict that will not provide sufficient assurance that the jurors were unanimous in their judgment. It has further risked the Defendants' being convicted not based upon the evidence against them with respect to each separate conspiracy (which, with respect to the first conspiracy, is all but absent for Ms. Hockridge, and which, with respect to the second, is all but absent for Mr. Reis), but based merely on their association as husband and wife, which carries with it the unavoidable implication of unified purpose and privately shared confidences. Such insinuations are unworthy of a federal criminal case.

Instead, the Court should require Count One to be dismissed in order to ensure that the Defendants are not wrongly convicted of conspiratorial conduct that, even by the Government's own lights, they had little or no involvement in. Doing so will ensure that the jury is properly instructed to consider the Defendants as the separate individuals they are.

Dated: March 31, 2025

Respectfully submitted,

BOIES SCHILLER FLEXNER LLP

*/s/ Blake C. Goebel*
BLAKE C. GOEBEL
1401 New York Ave, NW
Washington, DC 20005
Tel: (202) 895-5248
Fax: (202) 237-6131
*bgoebel@bsfllp.com*

*Attorneys for Defendant Nathan Reis*

JOHNSON, VAUGH & HEISKELL

*/s/ Michael P. Heiskell*
Michael P. Heiskell, TX Bar: 09383700
5601 Bridge Street, Suite 220

Fort Worth, Texas 76112
Tel: (817) 457-2999
Fax: (817) 496-1102
*mheiskell@johnson-vaughn-heiskell.com*

*Attorneys for Defendant Nathan Reis*


BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*

*Attorneys for Defendant Stephanie Hockridge*

GALLIAN FIRM

*/s/ Gregg Gallian*
Gregg Gallian, TX Bar: 24085952
3500 Maple Avenue, Suite 1150
Dallas, Texas 75219
Tel: (214) 432-8860
Fax: (972) 433-5835
*gregg@gallianfirm.com*

*Attorneys for Defendant Stephanie Hockridge*

23

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of March, 2025, a true and correct copy of the foregoing document was served on all counsel of record by operation of the Court's CM/ECF system.

Respectfully submitted,

/s/ Richard Finneran
RICHARD E. FINNERAN