**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:24 CR-00287-O |
| | § | |
| NATHAN REIS and | § | (01) |
| STEPHANIE HOCKRIDGE, a/k/a | § | (02) |
| STEPHANIE REIS, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' MEMORANDUM**
**IN SUPPORT OF THEIR RENEWED JOINT OPPOSED**
**<u>MOTION TO DISMISS COUNT ONE OF THE SUPERSEDING INDICTMENT</u>**

1

TABLE OF CONTENTS

Table of Authorities ............................................................................................................. 3

Discussion ............................................................................................................................ 9

I.   Count One of the Superseding Indictment Alleges at Least Two Separate
Conspiracies Concerning Separate Rounds of the PPP Program........................ 9

A. Count One Alleges Multiple Conspiracies Between April and August 2020,
During the PPP Program's Initial Round ......................................................... 10

B. Count One Also Duplicitously Describes a Conspiracy That Aligns with
PPP Round 2 ...................................................................................................... 11

II.   A Count Is Subject to Dismissal for Duplicity When It Charges More
Than One Crime, Including More Than One Conspiracy ................................... 13

A. Count One Alleges (at Least) Two Conspiracies and Is Therefore Duplicitous.............. 16

B. The Government's Cited Authorities Only Reinforce the Duplicity
of Count One...................................................................................................... 21

Conclusion ......................................................................................................................... 25

Certificate of Service ........................................................................................................ 27

US-DOCS\160076427.2

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Brooks v. United States*,
  164 F.2d 142 (5th Cir. 1947) ............................................................ 14

*Kotteakos v. United States*,
  328 U.S. 750 (1946) ................................................................... Passim

*United States v. Adan*,
  913 F. Supp. 2d 555 (D. Tenn. 2012) ................................................ 16

*United States v. Cardillo*,
  2015 WL 3409324 (D.N.J. May 27, 2015) ........................................... 4

*United States v. Elliot*,
  571 F.2d 880 (5th Cir. 1978) ............................................................ 15

*United States v. Fahra*,
  643 F. App'x 480 (6th Cir. 2016) ...................................................... 15

*United States v. Faulkner*,
  17 F.3d 745 (5th Cir 1994) ........................................................ 22, 23

*United States v. Guerra-Marez*,
  928 F.2d 665 (5th Cir. 1991) ............................................................ 16

*United States v. Gunselman*,
  643 F. App'x 348 (5th Cir. 2016) ...................................................... 23

*United States v. Hinton*,
  127 F. Supp. 2d 548 (D.N.J. 2000) ............................................. 13, 23

*United States v. Jones*,
  733 F. 3d 574 (5th Cir. 2013) ........................................................... 15

*United States v. Leadbeater*,
  No. 13-121-1 (JBS), 2015 WL 567205 (D.N.J. Feb. 10, 2015) ............... 4

*United States v. Sapyta*,
  390 F. Supp. 2d 563 (W.D. Tex. 2005) ....................................... 13, 23

*United States v. Starks*,
  515 F.2d 112 (3d Cir. 1975) ...................................................... 14, 23

*United States v. Swafford*,
  512 F.3d 833 (6th Cir. 2008) ..................................................... 14, 15

**Rules**

Fed. R. Crim. P. 12(b)(3) ................................................................... 13

3

## SUMMARY AND INTRODUCTION

On May 8, 2025, the Government obtained a Superseding Indictment (Doc. #163) again alleging, in a single count, that Defendants engaged in one, unified conspiracy to commit PPP fraud—even though the conduct at issue concerned distinct rounds of the PPP, separated by a five-month break in funding that was only restarted as a result of a new Congressional enactment on December 27, 2020. Despite having the opportunity in the Superseding Indictment to properly separate the multiple conspiracies alleged in the original indictment, the Government has doubled down on its plainly duplicitous allegations. Defendants therefore renew their motion to dismiss.[1]

During Round 1 of the Paycheck Protection Program ("PPP"),[2] which lasted from April 3, 2020, through August 8, 2020, Mr. Reis is alleged to have worked directly with two[3] borrowers to

---

[1]    This Court previously held that the Defendants had failed to carry their burden to demonstrate that Count One should be dismissed "at this stage," i.e., before trial. *See* Order (Doc. #137) at 2. Yet even if this Court were to reach the same conclusion with respect to the Superseding Indictment, Ms. Hockridge will renew her motion at the conclusion of the prosecution's case. Although Ms. Hockridge believes that Count One is duplicitous on its face, she is confident that as the evidence comes in, it will become all the more evident that Count One alleges multiple separate conspiracies in a single count. *See, e.g.*, *United States v. Leadbeater*, No. 13-121-1 (JBS), 2015 WL 567205, at *2–3 (D.N.J. Feb. 10, 2015) (denying pretrial motion to dismiss conspiracy count for duplicity without prejudice, and inviting defendant to renew his motion "after the prosecution rests" if the evidence adduced at trial proved multiple conspiracies); *United States v. Cardillo*, No. 13-121-2 (JBS), 2015 WL 3409324, at *3 (D.N.J. May 27, 2015) (same).

[2]    Technically, the "Round 1" of the PPP as described in this memorandum had two separate phases of its own, but the distinction between those two phases is immaterial to the instant motion. Thus, for ease of discussion, this memorandum will use "Round 1" to refer to the portion of the PPP that ran for the four-month period from April 3, 2020, through August 8, 2020, and "Round 2" to refer to the portion of the PPP that ran from January 12, 2021, through May 31, 2021, after Congress authorized a new round of funding on December 27, 2020, after a five-month hiatus. *See generally* Rpt. of. D. Ashier (Doc. #133-2) at ¶¶ 21–43, 49; SBA Inspector General Inspection Report No. 22-13, "SBA's Handling of Potentially Fraudulent Paycheck Protection Program Loans," https://www.oversight.gov/sites/default/files/documents/reports/2022-05/SBA-OIG-Report-22-13.pdf (May 26, 2022) ("SBA Report").

[3]    Notably, the original Indictment (Doc. #3) specifically alleged the involvement of two other coconspirators, but the Superseding Indictment removes those allegations. *See generally*

assist them in putting together loan applications that contained false information. Ms. Hockridge is alleged to have assisted one of these borrowers, but not the other. *See* Superseding Indictment (Doc. #163) ¶¶ 17(e)–(f). During Round 2 of the PPP program, which lasted from January 14, 2021, through May 31, 2021, the Defendants' started a new company, FinCap, Inc. ("FinCap"), which took on a new role as a lender service provider to two different banks, earning fees not from borrowers, but from the lenders themselves. Also as a part of that latter round of PPP fund distribution, Ms. Hockridge created a program called "VIPPP," which gave personalized service to certain individuals in applying for loans by recruiting referral agents to identify borrowers in need of assistance. Through FinCap's lender service provider business model and the VIPPP program, the Defendants helped hundreds of thousands of eligible borrowers gain access to PPP funds.

Round 1 of the PPP, established by the CARES Act, came to a close on August 8, 2020. At that point, by definition, any conspiracy that the Defendants are alleged to have engaged in had ended. Prior to that time, the Defendants are alleged to have worked directly with borrowers to assist them with preparing their PPP loan applications. But as of August 8, 2020, there were no more applications to submit, no more loans to be funded, and no indication as to whether or when any additional PPP funds would be made available. Thus, if there had been a conspiracy as the Superseding Indictment alleges, its objects would have been achieved (or not), and all of the alleged coconspirators would have exited whatever conspiracy they were engaged in. In short, whatever conspiracy the Defendants might have allegedly participated up until that time came to an end, at the latest, on August 8, 2020.

---

Superseding Indictment (Doc. #163); *cf.* Indictment (Doc. #3) ¶¶ 11–12 (omitted from Superseding Indictment).

It was not until months later, on January 14, 2021, that Round 2 of the PPP program began (with the publication of an implementing rule) as established and governed by a separate Congressional enactment, the Economic Aid Act, which set forth new guidelines and processes for obtaining new PPP loans. According to the Superseding Indictment (Doc. #163), it was in the lead up to that program that the Defendants "expanded [their] operations through . . . lender service provider agreement[s]" they entered into in October 2020 and April 2021. *See id.* ¶ 16(d). However, the Defendants did not simply "expand" their operations; they started entirely new companies organized or incorporated in various states including Wyoming, Arizona, and Delaware. Defendants managed operations across several entities and acted on behalf of multiple ***lenders*** to originate, process, service, and submit loan applications to the SBA from qualified PPP applicants. Under the lender service provider agreements described in the Superseding Indictment, Defendants' new company Fin Cap was now entitled to receive payments from ***lenders*** for processing borrower applications. Ms. Hockridge is also alleged during this time period to have separately created a program known as the "VIPPP" program (which did ***not*** exist during the earlier rounds of the PPP) whereby borrowers were offered a "personalized service" and dedicated support to help navigate the brand new and often daunting PPP loan submission process. *See id.* ¶ 16(e).

Despite Rounds 1 and 2 of the PPP being separated in both time and nature—as well as rapidly evolving conditions and changing regulations and guidance in the midst of a global pandemic—the Government has attempted to lump together the Defendants' alleged conduct during those two disparate rounds of the PPP into a single conspiracy in order to artificially reduce its burden of proof. Doing so is not only improper as a technical matter of pleading—here, it also carries the very real risk that the jury could return a nonunanimous verdict regarding supposed criminal conduct regarding two separate and distinct government programs. And not only are the

6

manner and means of the various conspiracies alleged to be different in the Superseding Indictment itself, but the nature of the allegations against the two defendants in each conspiracy are fundamentally distinct as well.

During Round 1, **Mr. Reis** is alleged to have directly helped Mr. Flores submit a false PPP loan application. Also during Round 1, Mr. Reis and Ms. Hockridge allegedly directly helped Coconspirator-1 submit a false loan application (though the Superseding Indictment details only **Mr. Reis's** work on that loan). *See* Superseding Indictment (Doc. 163) ¶ 17(f). During Round 2, by the Government's telling, **Ms. Hockridge** was allegedly the prime mover, being principally in charge of the VIPPP Program, a separate program that provided a "personalized service" to loan applicants in exchange for a fee, and which, according to the Superseding Indictment, involved the recruitment of "conspirators to work as VIPPP referral agents and coach borrowers on how to submit false PPP loan applications." *Id.* ¶ 16(e). The evidence will show that Mr. Reis had little or no involvement in that program. Instead, Mr. Reis was focused at that time on scaling Fin Cap, which ultimately helped hundreds of thousands of borrowers gain access to desperately needed funding in the midst of nationwide shutdowns and unprecedented economic uncertainty. And for the overwhelming majority of the loans processed by Fin Cap during that latter time period, the Government does not allege any fraud by the Defendants whatsoever.

The nature of the Government's evidence in each of the conspiracies alleged in Count One is also markedly different. To prove that the alleged conspiracy existed during Round 1, the Government evidently intends to introduce evidence of specific communications between borrowers and Mr. Reis (not Ms. Hockridge) that had allegedly put him on notice of the falsity of certain representations made by those borrowers. With respect to Round 2, by contrast, the Government evidently intends to introduce evidence that Ms. Hockridge conspired with a new

individual, Eric Karnezis, who was not involved in Defendants' conduct during Round 1, to submit fraudulent loan applications through the VIPPP program, although the Government does not allege that either Defendant had actual knowledge of the falsity of any application submitted by borrowers working with Mr. Karnezis.[4] For Round 1, the Superseding Indictment identifies only a few allegedly fraudulent loans, with a combined principal of *less than $140,000*. For Round 2, the Government has identified more than *400* loans it claims were fraudulently submitted through the VIPPP program, with a total loan principal *exceeding $60 million* (more than 400 times the principal of the loans the Indictment alleges as part of the first conspiracy). Thus, the multiple conspiracies alleged in Count One are markedly different in terms of their alleged timeframe, objects, manner, means, scale, participants, and proof.

Mr. Reis and Ms. Hockridge are husband and wife. But that does not make them jointly and severally liable for one another's alleged criminal activity. If Count One is permitted to be tried as a single count, there is a genuine risk that the jury might be invited to convict both Defendants without reaching unanimity as to which of multiple distinct conspiracies each defendant participated in (or whether any such conspiracy existed in the first place). And failing to require Count One to be re-pled before trial will prejudice the Defendants by requiring them to defend against multiplicitous counts as part of their opening statements and in their presentation of evidence. This Court should therefore dismiss Count One for improperly lumping together the alleged conspiracies during the first round of the PPP, which could have ended no later than August

---

[4]    Notably, Mr. Karnezis has recently pled guilty in a separate case out of the District of Oregon for his role in a conspiracy with others to submit fraudulent loans, after he confessed to the Government that he submitted knowingly false information for potentially hundreds of borrowers, a fact that, as the evidence will show, he deliberately concealed from Ms. Hockridge and the VIPPP team.

8

8, 2020, and the separate conspiracies alleged to have occurred during the PPP program's second round, which did not begin until January 14, 2021.

**DISCUSSION**

**I.    Count One of the Superseding Indictment Alleges at Least Two Separate Conspiracies Concerning Separate Rounds of the PPP Program**

The Superseding Indictment's Count One purports to allege a single conspiracy to submit, and cause the submission of, false and fraudulent applications for PPP loans. Superseding Indictment (Doc. #3) ¶ 14. But as outlined above, the allegations in the Superseding Indictment in fact describe multiple conspiracies, rendering Count One impermissibly duplicitous. On the one hand, Count One alleges conspiratorial conduct occurred during Round 1 of the PPP program, which ran from April to August 2020. *See generally* Rpt. of. D. Ashier (Doc. #133-2) ¶ 26 (explaining that PPP authorized approved lenders to originate loans starting on April 3, 2020); SBA Report, *supra*, at 1 ("Round one of PPP lending closed on August 8, 2020 . . . ."). During Round 1, Mr. Reis allegedly acted as a consultant to ***borrowers***, assisting individuals and businesses applying for PPP loans. Superseding Indictment (Doc. #163) ¶¶ 16(a)–(c). Because the PPP program stopped accepting loan applications on August 8, 2020, any alleged conspiracy (or conspiracies) relating to that program necessarily concluded on or before that date.

Count One also alleges, as part of the same purported conspiracy, distinct conduct occurring during Round 2, which created a new process for compensating lenders to incentivize lending to smaller borrowers. *Id.* ¶¶ 16(d)–(e). During Round 2, Defendants and unnamed "others" allegedly signed new contracts with ***lenders*** to facilitate PPP loan applications, developed a new system for helping borrowers apply for loans online, and developed a new VIPPP program to help borrowers obtain PPP loans. *See id.*

9

Allowing the Government to pursue multiple separate conspiracies described in the Superseding Indictment under a single count at trial will unfairly prejudice Defendants. Among other problems, the Government's attempt to conflate two separate programs that existed in two distinct time periods poses the "danger[] of transference of guilt from one to another across the lines separating conspiracies, subconsciously or otherwise." *Kotteakos v. United States*, 328 U.S. 750, 774 (1946). Defendants therefore respectfully request that the Court dismiss Count One of the Superseding Indictment.

## A. Count One Alleges Multiple Conspiracies Between April and August 2020, During the PPP Program's Initial Round

Count One alleges, in part, that a conspiracy existed beginning in April 2020, when the first round of the PPP program began, and continued through the conclusion of that round on August 8, 2020. *See generally* Rpt. of. D. Ashier (Doc. #133-2) ¶ 26; SBA Report, *supra*, at 1. The conspiratorial conduct alleged during Round 1 is extremely limited: it allegedly involved submitting applications for PPP loans only for the Defendants and two acquaintances—not vast swaths of the borrowing public. Superseding Indictment ¶ 16(a) ("Beginning in or around April 2020, Reis, Hockridge, and their coconspirators began submitting fraudulent applications for PPP loans for themselves and their businesses."); *see id.* ¶¶ 16(a)–(c), 17(a)–(c), (e)–(f).

More specifically, during Round 1, the Superseding Indictment alleges fraudulent acts by only Mr. Reis and Ms. Hockridge in submissions for Juuice Inc. and Body Politix LLC, two businesses owned by them separately. Superseding Indictment (Doc. #163) ¶ 17(a)–(c). The Superseding Indictment then alleges fraudulent acts by Mr. Reis, Mr. Flores, and other coconspirators (***not*** Ms. Hockridge) in a single submission for Mr. Flores's sole proprietorship, ¶ 17(e), and fraudulent acts by Mr. Reis, Coconspirator-1, and (with no details) Ms. Hockridge in a single submission for Coconspirator-1, ¶ 17(f).

10

All of the acts described above are alleged to have occurred between April and August of 2020, and for good reason—as of August 8, 2020, the second round of PPP had ended, and any conspiratorial objects therefore had either been achieved, or not.

### B.  Count One Also Duplicitously Describes a Conspiracy That Aligns with PPP Round 2

But Count One's allegations also embrace an alleged conspiracy in connection with an entirely separate round of the PPP program established by an entirely different federal law, which was passed on December 27, 2020, that created an opportunity for borrowers in a new round of PPP funding starting in January 2021. Round 2 differed in significant respects from the first round of the PPP—as did the alleged manner and means of any alleged conspiracy with respect to that second round of the program.

During the first PPP round, "many lenders opted to only accept applications from preexisting, and typically larger, customers." Rpt. of D. Abshier (Doc. #133-2) ¶ 27; *see also id.* ¶ 47 ("The report also noted that the initial implementation of the PPP did not prioritize rural and underserved markets. . . ."). For the second round, however, SBA "took several steps to make the PPP more accessible for the smallest and most vulnerable business owners," among other changes. *Id.* ¶ 36. For example, the SBA "made clear that self-employed borrowers could submit a draft (i.e., unfiled) Schedule C to calculate the eligible PPP loan amount," and also established a "14-day exclusive period where *only* those [the smallest businesses] would be able to apply for PPP loans." *Id.* ¶¶ 36, 37. The SBA also reopened the "PPP loan portal to the [community development financial institutions ("CDFIs")] and other community financial institutions first" in January 2021; such non-bank lenders had a "higher proportion of loans under $150,000 and served a greater percentage of businesses in low-to-moderate income [] areas." *Id.* ¶¶ 45, 46.

As described in the Superseding Indictment, after learning of the new regulations that would be applicable to PPP Round 2, the Defendants each took new and unprecedented steps to

help meet the long-underprioritized demand for loans among smaller, potentially less sophisticated borrowers. Mr. Reis, through the newly created Fin Cap company, helped to develop a financial technology platform to not only originate loans, but also to scale operations, which helped lenders process PPP applications within the narrow two-and-a-half month window originally set by Congress. Defendants created a new lender-service-provider business model that provided a straightforward, online application process for potential borrowers to use in obtaining loans, at no cost to the borrower. *See* Superseding Indictment (Doc. #163) ¶ 16(d).

Although the Government identifies the development of Blueacorn's new lender-service-provider business model as among the "manner and means" of the conspiracy alleged in Count One, the Government has not made any allegation that any actions the Defendants took in developing the new business model were fraudulent in any respect. Indeed, as the evidence will show, Blueacorn processed more than 750,000 applications for small businesses and others through its lender-service-provider platform, and the Superseding Indictment only identifies *two* borrowers that the Government even claims were known by Defendants to have submitted fraudulent applications.[5]

Also during PPP Round 2, Ms. Hockridge separately created the "VIPPP" program—which did not exist in Round 1—to provide additional assistance to certain individuals and businesses who sought more personalized service in connection with preparing their loan applications. *See* Superseding Indictment (Doc. #163) ¶ 16(e). As part of that program, Count One alleges that Ms. Hockridge and Mr. Reis recruited others "to work as VIPPP referral agents"

---

[5]    The Defendants are even not alleged to have had actual knowledge that the loan applications alleged to be fraudulently submitted by Eric Karnezis through VIPPP borrowers were false.

US-DOCS\160076427.2

(which they readily admit) and to "coach borrowers on how to submit false PPP loan applications" (which they categorically deny). *Id.*

## II.    A Count Is Subject to Dismissal for Duplicity When It Charges More Than One Crime, Including More Than One Conspiracy

"An indictment is duplicitous when two separate offenses are charged in a single count." *United States v. Sapyta*, 390 F. Supp. 2d 563, 566 (W.D. Tex. 2005); Fed. R. Crim. P. 12(b)(3)(B)(i). A duplicitous indictment "compromises a defendant's Sixth Amendment right to know the charges against him." *United States v. Hinton*, 127 F. Supp. 2d 548, 553 (D.N.J. 2000). But more than merely posing notice problems for a defendant, duplicity risks injecting ambiguity into a jury's verdict, not to mention the danger of a nonunanimous verdict. A general verdict against the defendant on one count that contains more than one crime "does not reveal whether the jury found him guilty of one crime[,] or not guilty [or guilty] of both"; as a result, the verdict will not show whether the jury was unanimous as to two crimes contained in the single count. *United States v. Starks*, 515 F.2d 112, 116 (3d Cir. 1975).

An indictment that combines multiple ***conspiracies*** into one count is likewise duplicitous—and duplicity on a conspiracy charge poses even greater dangers. *See generally Kotteakos*, 328 U.S. at 774 (explaining that lumping multiple conspiracies into one count violates the requirement for "separate statement[s] in different counts of related but distinct 'acts or transactions of the same class of crimes or offenses'"); *cf. Brooks v. United States*, 164 F.2d 142, 143 (5th Cir. 1947) (holding that a trial "was conducted too much . . . on the assumption that it was immaterial whether the proof showed one conspiracy with which all of the defendants were connected, or separate conspiracies with which some, but not all, of them were" (citation omitted)). Allowing the Government to proceed on an erroneous single-conspiracy theory when the Indictment actually alleges multiple conspiracies risks "imput[ing] to each defendant the acts and

statements of the others" (and of other supposed coconspirators) "without reference to whether they related to one of the schemes proven or another, and to find an overt act affecting all in conduct which admittedly could have affected only some." *Kotteakos*, 328 U.S. at 771; *cf. United States v. Swafford*, 512 F.3d 833, 843 (6th Cir. 2008) ("[I]nstead of having to prove each of the multiple conspiracies, which was necessary due to the failure to demonstrate a single conspiracy, the government offered evidence only as to the alleged single enterprise. Consequently, the jury could simply seize upon the most significant [inculpatory transactions] . . . and the most suspicious behavior exhibited by [the defendant] and then apply the evidence against the defendant vis-à-vis each of the alleged co-conspirators."); *cf. Brooks*, 164 F.2d at 143 (holding that, when the government charges a single conspiracy, "due process as to each defendant require[s] for a conviction that the evidence be strong enough to exclude every other reasonable hypothesis than guilt of that defendant on the *precise conspiracy charged*" (emphasis added)).

In short, as the Supreme Court has held, the Superseding Indictment's duplicitous approach poses the "danger[] of transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise"—here, a defined temporal line based on the termination (and later reauthorization) ***of the PPP itself***, shaped by the PPP's own established framework. *Kotteakos*, 328 U.S. at 774; *see also United States v. Fahra*, 643 F. App'x 480, 493 (6th Cir. 2016) (recognizing that allowing the government to rely on evidence of multiple conspiracies with many conspirators, but assert only one conspiracy charge, may mislead "the jury into assuming a union of criminal intent, an agreement to cooperate, and an increased degree of culpability, thereby causing significant prejudice").

Multiple factors determine whether a course of conduct represents one, or rather multiple, conspiracies. An allegedly single conspiracy may in fact be multiple separate conspiracies if they

14

occur at separate times, as well as if the "manner and means" of the conspiracies differ. *Fahra*, 643 F. App'x at 492–93 (holding that proving multiple conspiracies to support a single-conspiracy count is an impermissible variance). So too when the supposed conspirators do not share a single goal, are "not truly interdependent or where the various activities sought to be tied together cannot reasonably be said to constitute a unified scheme." *United States v. Elliot*, 571 F.2d 880, 901 (5th Cir. 1978); *Swafford*, 512 F.3d at 842 ("The government failed to prove that the methamphetamine cooks were acting in furtherance of a common goal or that there was any significant interdependence among them."); *see generally United States v. Jones*, 733 F. 3d 574, 580–81 (5th Cir. 2013) (identifying factors for identifying multiple conspiracies for purposes of double jeopardy); *United States v. Guerra-Marez*, 928 F.2d 665, 671 (5th Cir. 1991) (holding that conspiracies were separate based on an analysis of common goals, nature of the schemes, and whether participants overlapped); *United States v. Adan*, 913 F. Supp. 2d 555, 565 (D. Tenn. 2012) ("[W]hile a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy does not know every other member, it is necessary to show that each alleged member agreed to participate in what he knew to be a collective venture directed to a common goal." (cleaned up)).

    In *Kotteakos*, for example, the Government charged multiple defendants with one conspiracy to "induce various financial institutions to grant credit, with the intent that the loans or advances would then be offered to the Federal Housing Administration for insurance upon applications containing false and fraudulent information." 328 U.S. at 752. The alleged conspiracy was "executed through a common key figure, Simon Brown," who "undertook to act as a broker in placing for others loans for modernization and renovation, charging a five percent commission for his services." *Id.* at 752–53. He allegedly knew "when he obtained the loans, that the proceeds

15

were not to be used for the purposes stated in the applications." *Id.* The Court held that alleged conduct represented "not . . . a single conspiracy, but . . . several, notwithstanding only one was charged in the indictment," explaining that "no connection was shown between" the alleged conspirators who had "transacted business with Brown relating to National Housing Act Loans," except that "Brown had been the instrument in each instance for obtaining the loans." *Id.* at 754–55.

### A.  Count One Alleges (at Least) Two Conspiracies and Is Therefore Duplicitous

As outlined above and detailed further below, Count One alleges at least two conspiracies in a single count and is thus duplicitous. Most problematically, it impermissibly melds together alleged efforts to obtain fraudulent loans on behalf of unrelated borrowers during the first round of the PPP—which conspiracies, as a basic matter of logic, cannot have continued past August 8, 2020, when that program ended—and the second round of the PPP program, which did not begin until more than five months after the first round of the program had concluded. The disunity between the multiple conspiracies alleged in Count One is apparent from their timeframe, objects, manner, means, participants, scale, and proof.

### 1.  The Multiple Conspiracies Alleged in Count One Occurred at Different Purported Times

On the one hand, Count One alleges conspiratorial conduct with two borrowers during PPP Round 1, which stretched from April 3, 2020, through August 8, 2020. *See* Rpt. of. D. Ashier (Doc. #133-2) ¶ 26 (explaining that PPP authorized approved lenders to originate loans starting on April 3, 2020); SBA Report, *supra*, at 1 ("Round one of PPP lending closed on August 8, 2020 . . . ."); Superseding Indictment (Doc. #163) ¶¶ 16(a)–(c), 17(a)–(c), (e)–(f). Yet it also identifies alleged conspiratorial conduct occurring occurred thereafter, overlapping with PPP Round 2, when Congress passed a new law reauthorizing PPP funding and the SBA implemented regulations to

encourage loans to smaller borrowers. Rpt. of D. Abshier (Doc. #133-2) ¶¶ 34, 36–39; Superseding Indictment (Doc. #163) ¶¶ 16(d)–(e), 17(d), (g)–(i).

### 2. The Conspiratorial Conduct Alleged in Count One Did Not Have a Common Object

During Round 1, the Defendants allegedly obtained fraudulent loans for themselves and two individuals to obtain payments for their services directly from those *borrowers*, who paid Mr. Reis (not Ms. Hockridge) for his consulting services. *E.g.*, Superseding Indictment (Doc. #163) ¶¶ 17(a)–(c), (e)–(f). In Round 2, Defendants and "others" are alleged to have committed fraud in order to collect fees paid by *lenders* for their work as lender service providers, and *Ms. Hockridge* is alleged to have collected fees from borrowers who participated in the VIPPP program. *Id.* ¶¶ 16(d)–(e).

### 3. The Multiple Conspiracies Alleged in Count One Are Alleged to Have Employed Distinct Manners and Means

As part of the conduct alleged during Round 1, the Defendants (in multiple cases, Count One identifies Mr. Reis alone) and coconspirators allegedly falsified or helped falsify loan-application documents for borrowers with whom they had direct contact. *See* Superseding Indictment (Doc. #163) ¶¶ 17(a)–(c), (e)–(f). As a result, the Defendants understand from their counsel's conferences with the Government, the Government hopes to persuade the jury that the Defendants had direct knowledge that the borrowers' representations were actually false.

During Round 2, by contrast, the Defendants are alleged to have worked with others at Blueacorn to "collect[] and review[] applications from potential borrowers" under lender service provider agreements. *Id.* ¶ 16(d). Although the Superseding Indictment does not say so, it is undisputed that applications were sent to Fin Cap through an online portal. The Defendants *almost never* had any contact with borrowers who submitted their application directly through that portal

17

and therefore would not have had actual knowledge of any false representations in such loans where they never had contact with the borrowers in question.

Also during Round 2, Ms. Hockridge is alleged to have operated the VIPPP program that "offered a personalized services to help potential borrowers complete PPP loan applications" and "recruited coconspirators to work as VIPPP referral agents and coach borrowers on how to submit false PPP loan applications." *Id.* ¶ 16(e). With regard to that aspect of the Round 2 conduct, the Government apparently contends that Ms. Hockridge joined a conspiracy in which Eric Karnezis knowingly submitted fraudulent applications on behalf of borrowers. No similar allegations of recruitment or coaching of recruiters are alleged as part of the first conspiracy—nor could they be, since the VIPPP program did not even exist at the time of the first conspiracy.

### 4. The Multiple Conspiracies Alleged in Count One Are Alleged to Have Involved Different Participants

In Round 1, Mr. Reis was allegedly the prime mover. Indeed, Count One's allegations through August 2020 repeatedly focus primarily on him, to the exclusion of Ms. Hockridge: "Reis created," ¶ 17(a), "Reis submitted," ¶ 17(b), "Reis and other conconspirators[] submitted," ¶ 17(e). And only Mr. Flores is not alleged to have been involved in any unlawful conduct in Round 2. *See id.* ¶ 17(e).

On the other hand, Count One (and, more explicitly, the Government's discussions with the undersigned) suggests that Ms. Hockridge was the prime mover in during Round 2, particularly the VIPPP program. *See id.* ¶ 16(e) ("Hockridge and others offered a personalized service to help potential borrowers . . . ."). Moreover, Lender-2, as well as "referral agents," were only involved in Round 2, being are notably absent from any allegations relating to Round 1. *Id.* ¶ 16(d)–(e).

18

### 5. The Scale of the Round 1 and Round 2 Conduct Described in Count One Is Markedly Different

The conduct described in Count One relating to Round 1 concern Defendants (primarily Mr. Reis) and conspirators submitting allegedly fraudulent loan applications for themselves. The conduct described during Round 2 concerns a larger alleged enterprise: an arrangement with two lenders to help process borrower applications, and a VIPPP network of referral agents to help coach borrowers on applying for loans. During Round 1, the total loan principal the Superseding Indictment contends was fraudulent was ***not even $140,000***; in Round 2, the loans alleged to be fraudulent by the Government total to more than ***$60 million***. And in Round 1, the Superseding Indictment identifies ***only four*** allegedly fraudulent loans; in Round 2, the Government has identified ***more than 400***.

### 6. The Anticipated Proof Regarding Each Alleged Conspiracy Differs Drastically

With respect to the conduct described in Round 1, the Government's anticipated proof is relatively straightforward: the Government evidently seeks to introduce written communications and witness testimony from particular borrowers, as well as financial records of the Defendants themselves, in an effort to establish that four Round 1 loans were known by the Defendants (and primarily, Mr. Reis) to contain materially false information. Thus, the likely evidence presented by both parties with respect to those four Round 1 loans will likely focus on the Defendants' direct knowledge (or lack thereof) of the truth or falsity of specific statements in a relatively small universe of loan applications.

The anticipated evidence with regard to the Round 2 loans, however, bears little to no resemblance to the expected proof relating to the Round 1 loans. With regard to Round 2, the Government does not allege either Defendant had actual knowledge of the falsity of statements in virtually any of the loan applications that were processed during Round 2, but that they (or at least

US-DOCS\160076427.2

Ms. Hockridge) encouraged a single referral agent, Eric Karnezis, to falsify information in applications prepared on behalf of borrowers he was referring in order to allow them to obtain loans they would not otherwise qualify for. The conversations in question were not recorded or reproduced in writing; instead, whether they occurred or not depends almost entirely on the say-so of Mr. Karnezis. In other words, proof of the any conspiracy in Round 2 will rely almost entirely on uncorroborated witness testimony to establish whether any unlawful agreement ***even existed***. And importantly, Mr. Reis is not even alleged by the Government to have been a part of any such conversations. By alleging the multiple conspiracies as one, the Government hopes to impermissibly bootstrap the alleged criminal intent of the Defendants with respect to loans they are alleged to have directly discussed with borrowers during Round 1, to shore up the unsubstantiated claims of Mr. Karnezis as to instructions allegedly given to him by Ms. Hockridge (again, not Mr. Reis) during Round 2.

While all of the distinctions detailed above demonstrate the critical difference between the multiple conspiracies duplicitously charged in Count One, the night-and-day distinction in the proof is perhaps the most pernicious. Ms. Hockridge is alleged to have had almost nothing to do with any criminal conduct during Round 1, and Mr. Reis is alleged to have almost nothing to do with any criminal conduct during Round 2. Disproving the Government's allegations with respect to Round 1 will simply require the Defendants to show that they were not aware of any falsity in the applications they submitted, or assisted others in submitting; with respect to the Government's Round 2 theory, however, such evidence would be no defense. Instead, to disprove the Government's allegations relating to Round 2, the Defendants will have to persuade the jury that Mr. Karnezis's claims of having received direction from Ms. Hockridge on how to "coach" borrowers into submitting fraudulent applications are not to be believed.

The conflation of the multiple conspiracies alleged in Count One therefore has the potential to cause substantial prejudice to the Defendants and confusion for the jury in their respective trials. Imagine that Jurors 1 through 6 do not believe that either of the Defendants knew of any false information in any application submitted during the Round 1, but Jurors 7 through 12 do. Now imagine that Jurors 7 through 12 do not believe Mr. Karnezis's self-serving (and late coming) efforts to implicate Ms. Hockridge and think the Defendants did not know of any fraud in Round 2—but Jurors 1 through 6 find Mr. Karnezis's story to be credible. If the multiple conspiracies alleged in Round 1 and 2 had been properly pled as separate counts, the jury would hang on each of them—but because of the Government's effort to lump to the two distinct rounds of the PPP program together, the jury might nonetheless convict.

There are many more hypotheticals that could be invented, each more problematic than the last. Under any of them, the potential prejudice to the Defendants is extreme. But there is no prejudice to the Government whatsoever from requiring the jury to return separate verdicts on the multiple distinct conspiracies alleged in Counts One, thereby ensuring that their verdict—whether to convict or to acquit—will be unanimous.

**B. The Government's Cited Authorities Only Reinforce the Duplicity of Count One**

The Government has relied on *United States v. Faulkner*, 17 F.3d 745 (5th Cir 1994) to argue that the differences between the conduct described in Round 1 and Round 2 merely reflect different "sub-agreements" and "illegal objectives" under one conspiratorial umbrella and that Count One is therefore not duplicitous. *See* Resp. (Doc. #117) at 2. But the *Faulkner* court made clear that a single conspiratorial umbrella requires commonality, *e.g.*, a "common goal," "participants play[ing] different but important functions necessary to its success," and "considerable overlapping of participants." *Id.* at 761. None of those factors is present here.

21

Indeed, the facts establishing a single conspiratorial umbrella in *Faulkner* differ fundamentally from the facts here. There, the "scheme was simple in concept, though complex in its execution," and bore "similarities to a classic Ponzi scheme." *Id.* at 754. The conspiracy followed a regular pattern involving "two initial participants at the top," "intermediate purchasers," investors, and lenders. *Id.* The conspirators' dealings were "such that all were integral and important participants" in the conspiracy. *Id.* at 760. Here, by contrast, different PPP rounds clearly demarcate a boundary between conspiracies. The alleged efforts during Round 1 to obtain fraudulent loans for Defendants and two others did not share a common pattern with the vast enterprise started by Defendants in Round 2, which involved hundreds of thousands of borrowers applying through an online portal and a newly established "VIPPP" program to refer borrowers to Blueacorn. Defendants' work with respect to Round 1 was conceptually and functionally distinct from the much larger operation starting in Round 2. More specifically, as the Superseding Indictment itself shows, Ms. Hockridge was not integral to the alleged misconduct during Round 1, and Mr. Reis was not integral to the VIPPP program that only began in Round 2. Thus, the Government's cited authority does not justify its effort to lump at least two distinct endeavours, at different times, under different regulatory frameworks, into a single conspiracy.

## II.    In Light of Its Duplicity, This Court Must Dismiss Count One of the Indictment

As explained above, the Government gravely erred (twice) by charging more than one conspiracy in Count One. Its decision to do so risks both a nonunanimous verdict as to which Defendant participated in which conspiracy, as well as the improper transference of guilt across the multiple distinct conspiracies. As a result, the duplicitous Superseding Indictment warrants dismissing the offending count, thereby requiring the Government either to obtain a new indictment with the separate offenses charged separately, or to go to trial on the remaining counts of the Superseding Indictment. *See Sapyta*, 390 F. Supp. 2d at 566–67; *United States v. Gunselman*,

643 F. App'x 348, 353 (5th Cir. 2016); *Starks*, 515 F.2d at 118; *Hinton*, 127 F. Supp. 2d at 554. No remedy short of dismissal will be adequate to protect the Defendants from the unfair prejudice inherent in being tried on Count One, given its duplicity.

The Government has argued that the Court may cure any duplicity problem with an instruction that the jury must find unanimously that the Defendant is guilty with respect to at least one distinct act. Resp. (Doc. #117) at 5. But that instruction would not solve the problem. By the time the jury hears instructions, they will have already heard a multi-day trial in which the Government presented evidence and argument as if the Defendants engaged in a single conspiracy. Such a presentation risks hopelessly confusing the jury, inviting transference of guilt across conspiracies and a non-unanimous verdict. Moreover, merely instructing the jury that they must be unanimous as to a "distinct act" does not clearly explain the need to differentiate between separate conspiracies during different rounds of the PPP—the first of which entailed a small set of loans for borrowers directly connected to one or both of the defendants, with total loan proceeds under $140,000, and the other a referral network involving over $60 million in loans—and decide, unanimously, that either Defendant was part of a specific conspiracy.

Relatedly, the Court asked during the April 3, 2025 hearing whether the Court could address the duplicity problem through an interrogatory asking the jury if they unanimously agree about the Defendant's guilt for each conspiracy. Tr. (Doc. #122) at 40:3–41:5. Such an end-of-trial interrogatory would still allow the Government to present evidence and argument, throughout trial, based on a one-conspiracy theory. Such an approach would therefore still invite the jury to transfer guilt across the line between conspiracies. That approach would also mean that the jury would not realize that it needed to differentiate between conspiracies until the very end, meaning

that it might fail to track which evidence relates to which conspiracy during trial. Only Count One's dismissal will avoid the duplicity problem.

## III.    Count One's Duplicity Appears on the Face of the Indictment

The Court previously denied Defendants' motion to dismiss the original indictment "at this stage" because the issue turns on facts to be developed at trial. Order (Doc. #137). But the Government's Superseding Indictment even more clearly merges multiple distinct conspiracies than the original indictment did. The Superseding Indictment clearly identifies a course of conduct that stands out from the rest of the allegations: whereas most of Count One focuses on discrete, allegedly fraudulent loans tied directly to Defendants, a portion alleges a broad program to "collect[] and review[] applications from potential borrowers" on behalf of lenders, and to establish a VIPPP network for "referral agents to coach borrowers." Superseding Indictment (Doc. #163) ¶¶ 16(d)–(e). The Superseding Indictment's only attempt to tie this broader course of conduct to the rest of the allegations about discrete loans is to name both Defendants in both sets of allegations. But a defendant's involvement in multiple courses of conduct does not make a single conspiracy. *See Kotteakos*, 328 U.S. at 754–55, 768–69 (rejecting the argument that there was one conspiracy just because "each defendant was linked" to one central figure).

Moreover, the Superseding Indictment now reduces the allegations during Round 1 to only *two* borrowers and *two* loans aside from the Defendants' own loans, while still claiming that the conduct alleged during Round 2 of the PPP, which involved hundreds of loans for borrowers the Defendants never interacted with, is part of the same conspiracy. And, despite making those changes and having the opportunity to correct its earlier errors, the Government taken the simple step of at least two distinct conspiracies interrupted by the five-month termination and later

24

reauthorization of the PPP, thus doubling-down on its impermissible conflation of distinct courses of conduct into a single alleged conspiracy.

CONCLUSION

The Defendants deserve to be convicted or acquitted at trial based upon their own conduct. But by amalgamating multiple separate conspiracies, with different alleged participants, different alleged objects, and different alleged means, allegedly occurring at different times under different program rules and regulations, the Government risks obtaining an ambiguous verdict that will not provide sufficient assurance that the jurors were unanimous in their judgment. It has further risked the Defendants' being convicted not based upon the evidence against them with respect to each separate conspiracy (which, with respect to Round 1, is all but absent for Ms. Hockridge, and which, with respect to the Round 2, is all but absent for Mr. Reis), but based merely on their association as husband and wife, which carries with it the unavoidable implication of unified purpose and privately shared confidences. Such insinuations are unworthy of a federal criminal case.

Instead, the Court should require Count One to be dismissed in order to ensure that the Defendants are not wrongly convicted of conspiratorial conduct that, even by the Government's own lights, they had little or no involvement in. Doing so will ensure that the jury is properly instructed to consider the Defendants as the separate individuals they are.

Dated: May 29, 2025                                Respectfully submitted,

                                                   LATHAM & WATKINS LLP

                                                   /s/ *Kevin A. Chambers*
                                                   Kevin Andrew Chambers (*Pro Hac Vice*)
                                                   DC Bar No. 495126
                                                   555 11th Street NW, Suite 1000
                                                   Washington, DC 20004
                                                   Tel: (202) 637-2200

25

Fax: (202) 637-2201
*kevin.chambers@lw.com*

Matthew S. Salerno (*Pro Hac Vice*)
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
*matthew.salerno@lw.com*

*Attorneys for Defendant Nathan Reis*

Michael P. Heiskell, TX Bar: 09383700
JOHNSON, VAUGH & HEISKELL
5601 Bridge Street, Suite 220
Fort Worth, Texas 76112
Tel: (817) 457-2999
Fax: (817) 496-1102
*mheiskell@johnson-vaughn-heiskell.com*

*Attorneys for Defendant Nathan Reis*


BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*

*Attorneys for Defendant Stephanie Hockridge*

GALLIAN FIRM

*/s/ Gregg Gallian*
Gregg Gallian, TX Bar: 24085952
3500 Maple Avenue, Suite 1150
Dallas, Texas 75219
Tel: (214) 432-8860
Fax: (972) 433-5835

26

*gregg@gallianfirm.com*

*Attorneys for Defendant Stephanie Hockridge*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by operation of the Court's CM/ECF system.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN

27

US-DOCS\160076427.2