# lIN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:24 CR-00287-O |
| | § | |
| STEPHANIE HOCKRIDGE, a/k/a | § | (02) |
| STEPHANIE REIS, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANT STEPHANIE HOCKRIDGE'S MEMORANDUM IN SUPPORT OF HER MOTION FOR NEW TRIAL BASED ON NEWLY DISCLOSED EVIDENCE

i

T<small>ABLE OF</small> C<small>ONTENTS</small>

Table of Authorities ......................................................................................................... ii

Summary and Introduction ................................................................................................ 1

Legal Standard .................................................................................................................. 3

Discussion ......................................................................................................................... 4

    I.   Regardless of Its Good or Bad Faith, the Government Violated *Brady* and *Giglio* by Withholding Favorable Exculpatory and Impeachment Evidence ....................................... 4

        A.   The Government Was in Possession the Withheld Evidence Prior to Trial ................... 5

        B.   The Withheld Evidence Shows That Eric Karnezis Was Part of a Separate Criminal Conspiracy to Commit PPP Fraud That Predated His Being Introduced to Ms. Hockridge .. 6

        C.   The Withheld Evidence Undermines the Credibility of the Government's Star Witness, Eric Karnezis ...................................................................................................................... 10

    II.  The Withheld Evidence Was Material ............................................................................ 11

        A.   The Withheld Evidence Materially Undermines the Government's Case That Ms. Hockridge Knowingly Engaged in the Conspiracy Alleged in the Indictment ................... 12

        B.   The Withheld Evidence Materially Undermines the Government's Reliance on Eric Karnezis's Repeated Lies ................................................................................................... 16

        C.   At the Very Least, the Cumulative Effect of the Withheld Evidence on the Government's Case Establishes Its Materiality .................................................................. 21

    III. The Government's Violation of *Brady*, in Combination with Other Trial Errors, Warrants a New Trial in the Interest of Justice ................................................................................. 23

Conclusion ........................................................................................................................ 25

i

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brady v. Maryland*,
  373 U.S. 83 (1963)................................2, 3, 4, 5, 6, 7, 10, 11, 16, 19, 21, 22, 23, 25

*Giglio v. United States*,
  404 U.S. 150 (1972)...........................................................................................4

*Kyles v. Whitley*,
  514 U.S. 419 (1995).................................................................................5, 11, 23

*Smith v. Cain*,
  565 U.S. 73 (2012)...........................................................................................11

*Strickler v. Green*,
  527 U.S. 263 (1999)......................................................................................4, 23

*United States v. Auten*,
  632 F.2d 478 (5th Cir. 1980) .........................................................................5, 6

*United States v. Beacham*,
  774 F.3d 267 (5th Cir. 2014) ..........................................................................15

*United States v. Bowen*,
  969 F. Supp. 2d 546 (E.D. La. 2013)................................................................3

*United States v. Bowen*,
  799 F.3d 336 (5th Cir. 2015) ......................................................................3, 23

*United States v. Cessa*,
  861 F.3d 121 (5th Cir. 2017) ...................................................................4, 10, 11

*United States v. Deutsch*,
  475 F.2d 55 (5th Cir. 1973) .............................................................................6

*United States v. Dvorin*,
  817 F.3d 438 (5th Cir. 2016) ..........................................................................11

*United States v. Jindal*,
  621 F. Supp. 3d 727 (E.D. Tex. 2022)..........................................................3, 23

*United States v. McRae*,
  795 F.3d 471 (5th Cir. 2015) ......................................................................3, 24

*United States v. Poole*,
  735 F.3d 269 (5th Cir. 2013) ........................................................................3

*United States v. Runyan*,
  290 F.3d 223 (5th Cir. 2002) ........................................................................3

*United States v. Shah*,
  95 F.4th 328 (5th Cir. 2024) .....................................................................15, 16

*United States v. Sipe*,
  388 F.3d 471 (5th Cir. 2024) .....................................................7, 11, 21, 22, 23

*United States v. Weintraub*,
  871 F.2d 1257 (5th Cir. 1989) .......................................................................14

*United States v. White*,
  569 F.2d 263 (5th Cir. 1978) .........................................................................12

**Other Authorities**

Fed. R. Crim. P. 33(a) ...........................................................................2, 3, 4, 23

Department of Justice, *Justice Manual* ...................................................................6

## SUMMARY AND INTRODUCTION

Over three months after Ms. Hockridge's trial, the Government belatedly produced material, favorable evidence material to the defense as evidence the Government seeks to use at sentencing. While the newly disclosed is "new" to Ms. Hockridge and her counsel, it has not "new" to the Government: it has been in the Government's possession for years. The evidence in question includes recordings and transcripts of interviews conducted by the Government during its investigation into its star witness, Eric Karnezis. At trial, Karnezis claimed that Ms. Hockridge had taught him how to submit fraudulent PPP applications—despite a long, written chain of communications where Karnezis assured Ms. Hockridge of the validity of the applications he submitted and provided false explanations to Ms. Hockridge to dispel her suspicions. Given the lack of corroboration (and the presence of written contradictions) for his testimony, Karnezis's credibility (or lack thereof) was a central issue in Ms. Hockridge's trial. The newly disclosed materials, which the Government had in its possession for more than *two years* before Ms. Hockridge's trial, plainly discredits Karnezis's testimony. Yet the Government never disclosed the evidence to the defense until the jury had already rendered a verdict.

The Government's late-breaking production includes (1) an audio recording and MOI of a 2023 interview with Newly Disclosed Government Witness #1 ("GW-1"), *see* **Ex. A**,[1] (2) a transcript of an interview of Newly Disclosed Government Witness #2 ("GW-2"), *see* **Ex. B**, and (3) the audio recording and transcript of an interview of Newly Disclosed Government Witness #3 ("GW-3"), *see* Ex. C, all of whom were involved in fraudulent activities with Karnezis related to their PPP applications. The statements in those transcripts and recordings tell a very different story

---

[1]    At the Government's request, the names of witnesses in the newly disclosed evidence have been redacted and Ms. Hockridge has contemporaneously filed a motion seeking to file the referenced exhibits under seal.

from the one Karnezis testified to at trial, and they provide alternative explanations and motivations that Ms. Hockridge's counsel could have used to undercut his testimony and credibility on cross-examination. Given that such evidence was not only favorable but critical to Ms. Hockridge's defense to Count One of the Superseding Indictment, it should have been produced to the defense months ago and, at a minimum, before the jury returned its verdict based on an incomplete record.

The newly disclosed evidence is also material to Ms. Hockridge's defense because it raises a reasonable probability that the jury would not have convicted her if the evidence had been disclosed. It substantially bolsters Ms. Hockridge's arguments that Count One of the Superseding Indictment did not describe a single conspiracy but was unconstitutionally duplicative. It undercuts the Government's case that Ms. Hockridge knowingly joined *any* conspiracy. And it contradicts Karnezis's trial testimony in key aspects in which he appears to have twisted the facts to connect Ms. Hockridge to his own PPP fraud. Each of these on its own provides a substantial probability that the jury would not have convicted Ms. Hockridge of conspiracy. Considered together, the record is unequivocal that Ms. Hockridge was fundamentally deprived of her right to a fair trial, based on the Government's inexcusable delay in producing material, exculpatory evidence. The Court should therefore grant Ms. Hockridge's motion for a new trial.[2]

---

[2]    Ms. Hockridge and her codefendant Nathan Reis have filed a joint motion to compel the disclosure of additional evidence the Government has withheld. *See* Defs.' Joint Mot. to Compel (Doc. #332). The Court has yet to rule on that motion. While Ms. Hockridge is and has been entitled to that evidence, she respectfully submits that the Government's belated disclosures to date are alone sufficient to warrant relief under *Brady v. Maryland*, 373 U.S. 83 (1963).

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 33(b)(1), a defendant may move for a new trial on the basis of newly discovered evidence within three years of a guilty verdict. The Court may grant such a motion "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Court's inquiry on a Rule 33 motion "goes to the fairness of the trial rather than to the question of guilt or innocence." *United States v. McRae*, 795 F.3d 471, 481 (5th Cir. 2015) (citations omitted). Indeed, "if a trial court concludes for *any reason* that the trial has resulted in a miscarriage of justice," Rule 33 vests "the court [with] broad powers to grant a new trial." *United States v. Bowen*, 969 F. Supp. 2d 546, 574 (E.D. La. 2013) (emphasis added), *aff'd*, 799 F.3d 336 (5th Cir. 2015).

Rule 33 therefore provides a critical mechanism for this Court "to avoid injustice generally and to avoid a jury verdict for which one has compromised confidence specifically," *United States v. Poole*, 735 F.3d 269, 278 (5th Cir. 2013), including where "the defendant's 'substantial rights' have been harmed" by errors at trial, *United States v. Jindal*, 621 F. Supp. 3d 727, 735 (E.D. Tex. 2022) (citing *United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015)). While a motion for new trial on the basis of newly discovered evidence typically requires the movant to prove (among other things) that the new evidence is not merely impeaching and "would probably produce a new result," a motion for new trial based the Government's wrongful failure to produce favorable evidence before trial is reviewed under the less demanding *Brady* standard detailed below. *See United States v. Runyan*, 290 F.3d 223, 247 (5th Cir. 2002) ("[W]hen a motion for new trial based on newly discovered evidence raises a *Brady* claim, this court instead applies the three-prong *Brady* test to determine whether a new trial is appropriate.").

3

DISCUSSION

The Due Process Clause requires that the Government disclose evidence in its possession that is (1) favorable to a defendant and (2) material to guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). This affirmative obligation attaches "irrespective of the good or bad faith of the prosecution." *Id.* The *Brady* doctrine applies both to substantive and impeachment evidence. *See Giglio v. United States*, 404 U.S. 150, 154 (1972). And it "encompasses evidence known only to police and investigators and not to the prosecutor," such that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in [the] case, including the police." *Strickler v. Green*, 527 U.S. 263, 280–81 (1999) (quotation omitted). Here, the Government possessed favorable, material evidence that called into question the veracity of its star witness's trial testimony, yet it failed to disclose this information before trial. Ms. Hockridge is therefore entitled to a new trial, and her Rule 33 motion should be granted.

## I.    Regardless of Its Good or Bad Faith, the Government Violated *Brady* and *Giglio* by Withholding Favorable Exculpatory and Impeachment Evidence

Under the first step of the *Brady* analysis, a defendant can show that undisclosed "evidence is favorable . . . if it is either exculpatory or impeaching." *United States v. Cessa*, 861 F.3d 121, 128 (5th Cir. 2017). Here, the withheld evidence satisfies both prongs of the test. It is exculpatory because the information contained in the transcripts and recordings undermines the Government's claim that there was a single conspiracy and that Ms. Hockridge "joined the conspiracy and did so with specific intent," including its assertion that it was Ms. Hockridge who instructed Karnezis on how to submit fraudulent PPP applications. *Id.* at 130 (holding 302 reports were exculpatory where they supported defense theory that "although [the defendant] knew" his business partners "were engaged in drug trafficking, he did not join the money laundering conspiracy" he was charged with). And because key Government witness Eric Karnezis "testified inconsistently with"

4

statements by his coconspirators that are reflected in the transcripts and recordings, those statements (or the testimony of those witnesses) "could have impeached [his] testimony" and thus constitute *Brady* material on that independent basis. *Id.* at 131. On either basis, a new trial is warranted.

### A. The Government Was in Possession the Withheld Evidence Prior to Trial

*Brady*'s disclosure obligations extend to "any favorable evidence known to the others acting on the government's behalf in the case," including members of the police and other investigators. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). If *Brady* material is not in the direct possession of a prosecuting office but is possessed by another arm of the Government, the prosecution "has a duty to learn" of that evidence and disclose it. *Id.*; *see also United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (holding prosecution violated *Brady* by failing to "run an FBI or NCIC check on [a] witness," since that information was "known" to the government "in the context of the disclosure requirements").[3]

Here, the Government obviously possessed the withheld evidence—after all, it eventually produced the withheld evidence to the defense. The Government also possessed the withheld evidence before Ms. Hockridge's trial, as reflected by the dates of the recordings, transcripts, and reports themselves, all of which were generated by the Government. It also appears likely that at least the DOJ prosecutors entered in Ms. Hockridge's case had actual possession of the withheld evidence prior to trial, seeing as those prosecutors investigated Karnezis in a joint operation with

---

[3]    Indeed, the interview of GW-3 appears to have taken place the **same day** as Ms. Hockridge's proffer interview, and the interview of GW-2 the day prior. Despite that timing, FBI Special Agent Colin Friedemann testified at trial that the Government had not recorded interviews of any witnesses related to the case besides Anthony and Eric Karnezis. *See* 6/14 Tr. 175:4–7.

the District of Oregon. *See* Resp. to Joint Mot. to Compel (Doc. #332) at 4 n.3 (detailing coordination among the various offices following Karnezis's arrest).[4]

But even if the trial team in Ms. Hockridge's case did not have "present possession" of the withheld evidence prior to trial of the trial, its coordination with the U.S. Attorney's Office for the District of Oregon demonstrates that the prosecution nonetheless "had *access*" to the evidence and therefore "possessed" it for *Brady* purposes. *Auten*, 632 F.2d at 481 (citing *United States v. Deutsch*, 475 F.2d 55 (5th Cir. 1973)). Given the multi-district nature of the DOJ's investigation, the DOJ's supervision of a multi-district operation tied the various offices together as part of a single prosecution team. *See* U.S. Dep't of Justice, *Justice Manual* § 9-5.002(A) (noting that in "multi-district investigations," the "prosecution team" can include "both Assistant United States Attorneys and prosecutors from a Department litigating component or other United States Attorney's Office," thus reaching "parallel criminal and civil proceedings").

## B. The Withheld Evidence Shows That Eric Karnezis Was Part of a Separate Criminal Conspiracy to Commit PPP Fraud That Predated His Being Introduced to Ms. Hockridge

The withheld materials describe Eric Kanezis's involvement in a separate PPP conspiracy that existed before January 2021, which is when he first met Ms. Hockridge. 6/16 Tr. 136:21–136:22, 171:12–172:2. First, in the recording of GW-1's interview—which contains no mention of Ms. Hockridge (or even Mr. Reis)—GW-1 stated that in ***December 2020*** (the month before Ms.

---

[4]    The Government's Response is somewhat equivocal on this point, indicating that the Government "*obtain*[ed] and produc[ed] these witness interviews" in response to the defense's request of evidence supporting the Government's loss calculations at sentencing, without specifying precisely when it "obtained" the withheld evidence. Resp. (Doc. #332) at 5. But, as explained herein, the exact moment the members of the prosecution team obtained actual possession of the withheld evidence is irrelevant—it plainly had access to Karnezis-related files and evidence maintained by the United States Attorney's Office for the District of Oregon, where the interviews were conducted.

Hockridge was introduced Karnezis), GW-1 met GW-2 at a hookah lounge. *See* **Ex. A** at 2. According to GW-1, GW-2 conveyed that he could help GW-1 obtain a loan. *Id.* The following month, GW-1, GW-2, and two others met at the hookah lounge and discussed the loan opportunity, which was part of the PPP. *Id.* GW-2 and the two others outlined the process for obtaining a PPP loan on GW-1's behalf, in exchange for 30% of the loan proceeds. *Id.* at 3. GW-1 agreed to proceed, received a PPP loan, and paid the 30% fee. *Id.* at 4.

GW-1 further stated that authorities arrested him in early 2023 for PPP fraud, and he shared a jail cell with GW-2. *Id.* at 5. During their detention, GW-2 told GW-1 that "if anyone should 'snitch' they should be telling on '***ERIC*** [Karnezis[5]]' and 'BAYLESS [Cobb],[6]" whom GW-2 said were the people above him that were ***running*** 'whatever was going on.'" *Id.* at 6 (emphasis added). GW-2 "described either ERIC or BAYLESS . . . as the actual banker, and specifically stated that 'if there was anybody that needed to be snitched on [it's] ***ERIC*** and BAYLESS." *Id.* (emphasis added). GW-2 further explained that either Karnezis or Bayless Cobb was the "banker who [was] pushing the loans through." *Id.* Additionally, GW-2 stated that the "Banker" had run "up a lot of money the ***first round of funding***," referencing PPP Round 1, which ended months before Karnezis ever interacted with Ms. Hockridge. *Id.* (emphasis added). GW-2 also revealed that members of the infamous "Bloods" gang were part of the PPP fraud scheme, under Karnezis and Bayless Cobb. *Id.*[7]

---

[5]     GW-2's plea agreement says "there was an agreement between defendant and co-conspirators known and unknown, including [GW-2] and Eric Karnezis, to fraudulently obtain funds under the Paycheck Protection Program."

[6]     Bayless Cobb is a Karnezis associate whom Karnezis falsely identified to Ms. Hockridge as "Rick Diamond" and "Victor Strand." *See* 6/16 Tr. 93:20–94:3.

[7]     The newly disclosed evidence can constitute *Brady* material even though it is hearsay, including because it would provide the defense additional lines of inquiry to investigate the witnesses or cross-examine Karnezis. *See United States v. Sipe*, 388 F.3d 471, 485 (5th Cir. 2004)

Next, in the transcript of his interview, GW-2—consistent with GW-1's interview—admitted that that GW-2 was in a scheme with Karnezis and Cobb and that he would "pay ***them*** [not Ms. Hockridge] a third" of the proceeds. **Ex. B** at 21:6–14, 68:4–9 (emphasis added). GW-2 did not identify anyone "above" Karnezis and Cobb in the scheme. In addition, GW-2 stated that the scheme involved money laundering. *Id.* at 145:22–25.

Finally, the Government interviewed GW-3—one of Karnezis's clients who had submitted a PPP loan application. In that interview, GW-3 stated that another Karnezis associate approached him in early ***2020***, even prior to Round 1 of the PPP program, and helped GW-3 apply for a fraudulent EIDL loan. **Ex. C** at 4:15–21. Then, during ***Round 1*** of the PPP program (again, prior to Ms. Hockridge's ever meeting Karnezis), Karnezis's associate approached GW-3 again to tell him about "Eric" (i.e., Karnezis), who could get GW-3 $1 million in exchange for 35% of the loan proceeds. *Id.* at 12:14–13:19. Karnezis told GW-3 that Karnezis had a "guy in the SBA" who was "bulletproof." *Id.* at 20:7–11. Then, in 2022, well after Ms. Hockridge left Blueacorn, Karnezis told GW-3 that he would need to send an additional $150,000 to "Jack Whitehead" at Blueacorn to get his loan forgiven.[8] *Id.* at 41:8–9, 50:11–19, 52:15–19. In contrast, Karnezis testified at trial that he and his cohorts charged borrowers fees of between 2.5% and 10%. 6/16 Tr. 145:19–145:23; *see also* 147:8–147:10. Critically, GW-3 stated that the name "Stephanie" does not "ring a bell." *Id.* at 96:22–24.

---

("Evidence may be material under *Brady* even though it is inadmissible. . . . Because of the requirement that the outcome of the proceeding be affected, we often consider whether the suppressed, inadmissible evidence would have led to admissible evidence.").

[8]    Ms. Hockridge is not aware of any person affiliated with Blueacorn named "Jack Whitehead," who may very well be yet another fictious person created by Karnezis, likely as cover for asking for more money. Neither Blueacorn nor VIPPP charged additional fees upon loan forgiveness. *See* 6/17 Tr. 331:8–20.

Together, the withheld pieces of evidence illustrate Karnezis's involvement in a criminal conspiracy that (1) existed *before* January 2021, when he first met Ms. Hockridge, (2) was *separate* from the alleged VIPPP conspiracy, and (3) continued *after* Ms. Hockridge left Blueacorn. GW-1 described Karnezis's involvement in a conspiracy to obtain PPP loans during the "first round of funding" for PPP—i.e., in mid-2020—and that also involved a ***December 2020*** meeting about obtaining a PPP loan. GW-3 described being personally asked by Karnezis for an additional fee in ***2022*** (supposedly to be sent to "Jack Whitehead" at Blueacorn), even though Ms. Hockridge left Blueacorn in mid-April ***2021***. *Compare* **Ex. C** at 41:3–9, *with* 6/17 Tr. 350:16–351:3. And as to the distinct nature of the conspiracy described by Karnezis's coconspirators and the one he testified to at trial, the scheme GW-1 described involved gang members, money laundering, and paying the conspirators 30% of the loan proceeds—totally unlike conspiracy under which the Government charged Ms. Hockridge and to which Karnezis testified at trial.

On top of that, GW-3 described Karnezis's scheme as charging an initial fee of 35% of the loan proceeds, then explained that Karnezis increased the fee by another 5% because he claimed Blueacorn allegedly had "received more applications than they could cover," and that Karnezis personally demanded more money to get GW-3's applications approved. **Ex. C** at 73:15–25, 75:9– 23. The only people on the phone call where Karnezis demanded more money were GW-3, Karnezis himself, and Karnezis's associate (who did not work for Blueacorn or VIPPP). *Id.* at 78:6–8. The indictment does not allege anything about those transactions, which undermine the claim that Karnezis was engaged in the same conspiracy as Government claims Ms. Hockridge was involved in during "Round 1" of the PPP funding in early 2020.

Put together, the withheld evidence supports Ms. Hockridge's defense in at least two ways. By painting a fuller picture of Karnezis's activities, which were distinct from and inconsistent with

the fraudulent conspiracy alleged in Count One of the Superseding Indictment, the withheld evidence bolsters Ms. Hockridge's argument at trial that the Government's indictment impermissibly lumped together numerous distinct courses of conduct during the two distinct rounds of the PPP. Similarly, by implicating Karnezis with a cast of characters who did not know Ms. Hockridge, the withheld evidence makes it less likely that Ms. Hockridge knowingly agreed to join any conspiracy in the first place. And, because the withheld evidence "len[ds] support to" Ms. Hockridge's "trial theory," it is therefore "favorable" to the defense for *Brady* purposes. *Cessa*, 861 F.3d at 130.

### C. The Withheld Evidence Undermines the Credibility of the Government's Star Witness, Eric Karnezis

In addition to undermining the Government's theory as to Ms. Hockridge's involvement in the conspiracy charged in Count One, the Government's late-breaking revelations undermine at least three important aspects of Karnezis's testimony—and thus, the Government's case against Ms. Hockridge.

First, Karnezis testified that he only started working with Ms. Hockridge to process PPP loans in January 2021, 6/16 Tr. 136:21–136:22, 171:12–172:2, based on training he received from Mr. Reis in December 2020 or January 2021, 6/16 Tr. 65:19–65:25; *see also id.* at 106:9–106:14. Yet GW-1's account indicates that Karnezis was involved in PPP loan fraud even earlier— including during the ***first*** round of PPP in mid-2020. That claim is corroborated by GW-3's statements that he received PPP loans in 2020 through Karnezis's associate. *See* **Ex. C** at 26:3–14, 27:6–11.

Second, Karnezis portrayed himself as merely ***following*** Ms. Hockridge's training and instructions to commit PPP fraud in 2021. *See, e.g.*, 6/16 Tr. 71:9–71:21, 72:16–72:17, 74:2–74:11, 107:10–107:14. Yet GW-1's account paints Karnezis as the ***leader*** of the conspiracy, along with

Bayless Cobb. GW-3's statements undermine the notion that Karnezis was simply following orders from Ms. Hockridge, as he recounted Karnezis as conspiring with a corrupt SBA employee to get loan applications approved and charging a 35% fee (with a 5% follow-up in 2022)—a far cry from the 2.5% to 10% that Karnezis said his customers were charged. *Compare* **Ex. C** at 12:23–13:5, 41:3–9, *with* 6/26 Tr. 146:19–23.

Third, despite the fact that his loans account for more than 90% of its proposed loss calculation, the Government contends that Karnezis's fraud was merely an extension of the conspiracy. Yet GW-1's and GW-2's accounts describe Karnezis as involved in a conspiracy that differed fundamentally from the Government's allegations, because, for example, the Karnezis conspiracy involved gang members, money laundering, and a 30% fee.

## II.  The Withheld Evidence Was Material

Withheld evidence is material, and thus a violation of the Fifth Amendment, if, among other things, "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Cessa*, 861 F.3d at 128 (quoting *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016)). A "reasonable probability" is less than a preponderance of the evidence—it "does ***not*** mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73, 75 (2012) (cleaned up, emphasis added) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). "When there are a number of *Brady* violations, a court must analyze whether the cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result." *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004). Here, there is far more than a "reasonable probability" that the outcome of the trial might have differed had the withheld evidence been disclosed. The evidence "would have allowed

11

[Ms. Hockridge] to attack the government's case from every angle," *id.* at 488—both as to the Government's theory of the case and as to the credibility of its key witness. Thus, the withheld evidence easily clears the low bar of materiality under *Brady* and warrants a new trial. *Id*.

### A. The Withheld Evidence Materially Undermines the Government's Case That Ms. Hockridge Knowingly Engaged in the Conspiracy Alleged in the Indictment

At trial, Ms. Hockridge maintained that the Government's case against her suffered from at least two fatal defects: that the Government could not prove beyond a reasonable doubt that she knowingly joined ***any*** conspiracy, and that the Government presented evidence not of a single conspiracy but of multiple ***different*** conspiracies. The withheld evidence further exposes both of those flaws, creating a reasonable probability that the jury would not have found Ms. Hockridge guilty beyond a reasonable doubt, if only she had been able to use the withheld evidence to challenge the testimony and credibility of the Government's key cooperating witness, Eric Karnezis. The interest of justice therefore requires that Ms. Hockridge be granted a new trial.

### 1. Had Ms. Hockridge Been Able to Investigate and Introduce Evidence Relating to the Withheld Evidence, It Would Have Decreased the Likelihood That the Jury Would Have Convicted Her of Conspiring with Karnezis

The withheld evidence creates a reasonable likelihood that the jury might not have found that Ms. Hockridge knowingly joined a conspiracy with Karnezis.[9] It was the Government's burden to prove "beyond a reasonable doubt that a conspiracy existed, that ***the accused knew it*** and, ***with knowledge***, voluntarily ***joined*** it." *United States v. White*, 569 F.2d 263, 266–67 (5th Cir. 1978) (emphasis added, citation omitted). The Government's trial evidence that Ms. Hockridge ever engaged in a fraudulent conspiracy with Karnezis was thin. Importantly, the contemporaneous ***written*** evidence completely contradicted the Government's theory: it showed (1) that Karnezis

---

[9]    That probability is only increased by the fact that Ms. Hockridge was acquitted on the remaining counts of the Superseding Indictment.

lied to Ms. Hockridge to cover up fraud he was committing and (2) that Ms. Hockridge had repeatedly instructed her employees not to accept fraudulent applications and shared guidance on how to avoid fraud. *See, e.g.*, DE-5221 (message from Ms. Hockridge to members of the VIPPP team: "[P]lease take a moment to read this. . . . The Secret Service alert contains fraud indicators for PPP Application fraud. . . . If you ever suspect fraud, please let me know!"); DE-1509 (message chain from Ms. Hockridge providing "an update on the 'Rick Diamond Situation'" in which she describes attempts to rectify fraud by withdrawing fraudulent applications and in which she advises VIPPP team members to seek applicant verification of loans that may appear fraudulent). To circumvent the facts in hopes of a more favorable sentencing recommendation, Karnezis concocted a just-so story that all these communications were in fact evidence that there **was** a conspiracy, but that Ms. Hockridge wanted to cover it up by leaving a "clean" paper trail.

The withheld evidence, by contrast, provides a much more plausible explanation: Karnezis was lying to Ms. Hockridge because he was involved in an independent fraudulent conspiracy that allowed him to squeeze borrowers for a higher fee than Ms. Hockridge was charging within her own channel and that Ms. Hockridge would have shut down had she known about Karnezis's fraud. Nor did the Government present any evidence, much less evidence beyond a reasonable doubt, that Ms. Hockridge knowingly joined a scheme like the one described by GW-1 and GW-2. Neither GW-1 nor GW-2 knew anything about Ms. Hockridge; they stated that Karnezis and Bayless Cobb were the leaders of their conspiracy—the same Bayless Cobb whose identity Karnezis **hid** from Ms. Hockridge and whose fraudulent loan applications Ms. Hockridge **stopped** from being submitted to the SBA. *See, e.g.*, DE-40.

GW-3's interview transcript further reveals that Karnezis and his associates were charging substantially more for submitting a PPP loan application—35%, followed by a later squeeze for

an additional 5%—than the 2.5% to 10% processing fee Karnezis said he charged his VIPPP clients. In other words, for Ms. Hockridge to be part of this conspiracy, she would have been cutting herself out of *any* benefit from the huge cut that Karnezis took and that all of his *other* co-conspirators shared in. The jury heard no evidence tying Ms. Hockridge to anything like this belatedly disclosed scheme. But the more Karnezis could have been shown to have worked independently from and at cross-purposes with Ms. Hockridge, the less likely it is that the jury would have found beyond a reasonable doubt that Ms. Hockridge conspired with him.

The newly disclosed evidence further buttresses Ms. Hockridge's steadfast assertion at trial that she never conspired with Karnezis but acted consistently with the exculpatory communications she was ultimately permitted to introduce. *See United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989) ("[W]here the withheld evidence would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material."). What's more, the newly disclosed evidence places Karnezis in a conspiracy that both started before and continued after he worked with Ms. Hockridge at VIPPP, involving people who had no connection to Blueacorn or Ms. Hockridge, with Karnezis and Cobb the top of the pyramid. If the jurors had heard evidence about GW-1, GW-2, and GW-3, there is at least a reasonable probability that they would have acquitted Ms. Hockridge on Count One of the Superseding Indictment, as they did on the other charges against her.

## 2. Had the Newly Disclosed Evidence Not Been Withheld, It Would Have Decreased the Likelihood That the Jury Would Have Found That Ms. Hockridge Was Part of the Conspiracy Charged in the Superseding Indictment

Given the night-and-day evidence regarding Karnezis's involvement with GW-1, GW-2, and GW-3 and the nature of Karnezis's involvement with Ms. Hockridge, there is also a reasonable probability that the withheld evidence would have convinced the jury that the conspiracy Karnezis

14

was part of ***was not the conspiracy charged*** in the Superseding Indictment. As Ms. Hockridge has previously explained, the Government had to prove that Count One of the Superseding Indictment referred to a single conspiracy, while the evidence showed at least two distinct conspiracies that took place at different times and with different manners and means. *See, e.g.*, Mem. ISO Renewed Mot. for Judgment of Acquittal (Doc. #267) at 24–32. To prove the existence of a single conspiracy, the Government had to demonstrate "the existence of a common goal," a similar "nature of the scheme," and "the overlapping of the participants in various dealings." *United States v. Shah*, 95 F.4th 328, 361 (5th Cir. 2024) (quoting *United States v. Beacham*, 774 F.3d 267, 273 (5th Cir. 2014)). The withheld evidence, however, would have seriously compromised the Government's efforts to make those showings.

The withheld evidence drives home that any conspiracy involving Karnezis during Round 2 of the PPP program in 2021 simply could not have been the same conspiracy as what the Government alleges occurred during Round 1 in 2020. Most notably, the manner, means, and members of the conspiracy described in the withheld evidence diverge substantially from the activities alleged to have occurred during the first half of 2020. The activities in early 2020— which largely involved loan applicants personally known to Mr. Reis, Flores, and others—look nothing like the course of conduct described in the newly disclosed evidence: a scheme involving members of the infamous "Bloods" gang, who were creating fake businesses and funneling applications to Karnezis for processing by his contact at the SBA. According to GW-3, Karnezis's conspiracy involved a two-part fee structure: charge 35% of the loan amount as an upfront price for submitting a loan application and calling up a corrupt SBA member to shepherd the loan through the approval process, ***then*** reach out and charge an additional 5% on the grounds that there was only a little bit of money "to distribute" and there would be "a lot of empty chairs." **Ex. C** at

15

74:9–24. Finally, several key players in Karnezis's conspiracy, as described in the newly disclosed evidence, were unknown and unrelated to Ms. Hockridge—and in several cases committed their crimes during Round 1 of the PPP, before Ms. Hockridge had even met Karnezis.

The withheld evidence further thus suggests that Karnezis's conspiracy started independently from Ms. Hockridge. It shows a completely different manner and means, and reveals entirely different participants, than the Government's evidence of a conspiracy at VIPPP during the first few months of 2021. Those courses of conduct lack any "common goal," a similar "nature," or substantial "overlapping of the participants." *Shah*, 95 F.4th at 361 (quotation omitted). And the Government has produced no evidence tending to show that Karnezis's conspiracy ever merged with a conspiracy involving Ms. Hockridge, or that Karnezis's original goals and conduct ever morphed to cover the different goals and conduct which he claimed to have carried out with Ms. Hockridge's help. In other words, if Ms. Hockridge *were* conspiring with Karnezis in the scheme revealed by the newly disclosed evidence, her conduct could not have formed part of the same conspiracy as charged in the indictment. There is thus a reasonable probability that, if the withheld evidence had been disclosed to Ms. Hockridge so she could call GW-1, GW-2, and GW-3 as witnesses (or develop further evidence based on their interviews), the jury would not have found beyond a reasonable doubt that Ms. Hockridge was guilty of the conspiracy alleged in the indictment. The evidence is therefore material under *Brady* and warrants a new trial.

**B.  The Withheld Evidence Materially Undermines the Government's Reliance on Eric Karnezis's Repeated Lies**

The jury acquitted Ms. Hockridge of substantive fraud counts that the Government alleged involved prosecution witnesses Devin Hochberg and Jimmy Flores. Its case that Ms. Hockridge was involved in a conspiracy in 2021 therefore relied heavily on the credibility of its star witness, Eric Karnezis. Karnezis, who was testifying pursuant to a plea agreement and hoping for a lighter

16

sentence, told an apparently damning story: that he met Ms. Hockridge and began committing fraud at the start of PPP Round 2 in January 2021, 6/16 Tr. 65:19–65:25; *see also id.* at 106:9–106:14; that Ms. Hockridge instructed him on how to commit fraud, *id.* at 71:9–71:21, 72:16–72:17, 74:2–74:11, 107:10–107:14; and that Ms. Hockridge wanted to keep a "clean" paper trail, so the evidence that she was trying to ***prevent*** fraud at Blueacorn was transmogrified into evidence of the conspiracy itself, *id.* at 96:20–25. Yet the newly disclosed evidence undermines every part of that story.

The first new hole in Karnezis's testimony is the timing. At trial, Karnezis testified that he met Bayless Cobb "at a Ford dealership" in February 2021, after Karnezis started submitting loan applications to VIPPP. 6/16 Tr. at 190:15–22. But the report of the Government's interview with GW-1 indicates that both Karnezis and Bayless Cobb were involved in "the first round of funding,"—i.e., the PPP Round 1 that ran from May until August of ***2020***. *See* **Ex. A** at 7. Evidence that Karnezis was involved in fraud with Cobb before Karnezis worked with Ms. Hockridge would have undermined his credibility and unraveled the story that it was Ms. Hockridge who coached him on how to commit fraud. Likewise, the newly disclosed evidence reveals Karnezis as the mastermind of a separate scheme to commit PPP fraud, alongside Cobb. GW-3 told Government investigators that he was introduced to Karnezis as someone who "ha[d] a guy in Sacramento who works with the SBA," which is nothing like the means of the alleged conspiracy the Government accused Ms. Hockridge of joining. *See* **Ex. C** at 12:23–13:2. As such, the new evidence seriously challenges Karnezis's claims that he ***learned*** to commit fraud from Ms. Hockridge and Mr. Reis and that he merely ***followed*** their lead in doing so. And if Ms. Hockridge had been able to impeach Karnezis with the newly disclosed evidence—or if she had enough information to have called

17

GW-1 and GW-2 as witnesses—she would have been able to undercut the alleged ties between herself and Karnezis's criminal activities.

The Government's interview of GW-3 further provides material to impeach Karnezis by contextualizing one of the Government's trial exhibits. GW-3's interview indicates that GW-3 submitted a false PPP loan application with Karnezis's assistance. **Ex. 3** at 12:23–13:11. When an SBA investigator called GW-3 and left a voicemail inquiring about his PPP loan application, Karnezis messaged Ms. Hockridge for advice. Karnezis explained, "I never put [GW-3's] phone number on the application so I'm wondering if this is legit?" *See* GX35 at 79–80. Ms. Hockridge replied that Karnezis should "Just have [GW-3] talk to the SBA guy and provide all necessary paperwork. He should be just fine. . . . Capital plus was probably being safe rather than sorry." *Id.* While Ms. Hockridge had this exhibit before trial, she lacked the essential context of GW-3's interview to demonstrate to the jury that these messages showed Karnezis asking about a loan application *he* knew was fraudulent but Ms. Hockridge *did not* know was fraudulent. GW-3's interview would have allowed the defense to undercut Karnezis' credibility (by showing that he lied to Ms. Hockridge) and to underscore the implausibility of the Government's theory that Ms. Hockridge had knowingly conspired with Karnezis to commit fraud.

Finally, when Ms. Hockridge's counsel asked why Karnezis had kept full knowledge of his Cobb-related coconspirators from Ms. Hockridge, he testified that he wanted to be able to collect his commission from the borrowers. 6/16 Tr. at 205:8–14. But the evidence from GW-2 and GW-3 casts doubt on that testimony by painting Karnezis as collecting 35% (not the 10% that he testified to) as a fee for the borrowers he conspired with. In other words, Karnezis was hiding his own fraudulent activities from Ms. Hockridge because he, without her knowledge, was running a personally lucrative fraudulent conspiracy and using Ms. Hockridge's status as a loan processer

to further his own interests. Plus, Karnezis continued to squeeze an additional 5% out of his "clients," such as GW-3, *after* Ms. Hockridge had already left Blueacorn and after the alleged conspiracy in the Superseding Indictment had ended. *See* **Ex. C** at 41:3–9. Evidence that Karnezis had an even more powerful financial incentive to hide his fraudulent activities from Ms. Hockridge seriously undermines his uncorroborated claim that he and Ms. Hockridge discussed his fraud in off-the-record conversations—the only evidence the Government had to connect Ms. Hockridge to Karnezis's admitted fraud.

In its response to Ms. Hockridge's joint motion to compel additional exculpatory material, the Government argues that the withheld evidence is not material under *Brady* because GW-1's and GW-2's statements were not reliable. Resp. (Doc. #332) at 4–9. But the Government's *ipse dixit* is not enough—particularly when the Government believes *some* of the statements in the newly disclosed evidence are sufficiently reliable to bolster its loss calculations at sentencing. Ms. Hockridge at least had the right to investigate the claims made in the newly disclosed evidence to determine how they could have been used at trial. Moreover, the Government's response presumes that Karnezis was truthful when he confessed in custody that he did not have contacts at the SBA (contrary to what he had told GW-2). But Ms. Hockridge had the right to confront Karnezis with his inconsistent statements to the jury—not the Government—could judge his credibility. And although the Government claims to have evidence connecting **Mr. Reis** to Karnezis before 2021, there is *no* evidence that Ms. Hockridge knew Karnezis at that time. *Cf.* Resp. (Doc. #332) at 9 n.8.

The Government attempts to shore up its argument by again misconstruing the documentary record in the case. While it claims that exhibits GX-35A and GX-35C are evidence of Ms. Hockridge "instructing Eric Karnezis" to "invent[] numbers" and make false documents

"look legitimate," *see* Resp. (Doc. #332) at 8–9, these documents show nothing of the sort. Exhibit 35A contains repeated instances of Ms. Hockridge preventing and rectifying fraud, such as withdrawing and investigating "Rick Diamond" loans and mocking applicants who submitted suspicious documents for applications the Government did not establish were ever submitted to the SBA. *See, e.g.*, Ex. 35A at 17 (Ms. Hockridge describing one group of applications that "needed to be cross-checked to see if they were fraud" and another group of "109 applications that were all submitted by the same guy ["Rick Diamond" / Bayless Cobb] with Schedule Cs not filled out in good faith," where Ms. Hockridge "had to Audit each one by asking [the applicants] to fill out a new Schedule C and provide supporting documentation, including 1099s and other forms of payment to prove their amount"). And Exhibit 35C shows only Ms. Hockridge coaching Karnezis on how a properly completed loan application should look—but nowhere in Exhibit 35C does Ms. Hockridge instruct Karnezis to invent numbers not provided to him by the borrowers. The only reason the Government can say that the ***documents*** support its case is because Karnezis's ***testimony*** added extraneous information that altered and sometimes contradicted what the documents themselves show. *See* 6/16 Tr. 121 ("Q: Did you understand Ms. Hockridge to be telling you [in Exhibit 35C] to get real information from the borrowers. A: No."). In other words, it all comes back to whether Karnezis was credible, which is exactly Ms. Hockridge's point. The newly disclosed evidence undermines his credibility, and Ms. Hockridge should have been able to have the benefit of the withheld evidence (and any admissible evidence discovered through further investigation) in attacking his credibility at trial.

Because Karnezis was the Government's key witness in attempting to prove Ms. Hockridge knowingly joined a criminal conspiracy, his credibility was essential to the Government's case. And although Karnezis presented himself at trial as a reformed criminal trying to right his wrongs,

the newly disclosed (and previously withheld) evidence only solidifies him as a fundamentally untrustworthy person who will lie without hesitation to save his own skin. The jury should have been able to consider whether his testimony was credible in light the *full* record, not the record as artificially abridged by the Government's decision to withhold favorable, material information from Ms. Hockridge until after the jury returned its verdict. Had the Government honored its obligations under *Brady* and its progeny and Ms. Hockridge had been able to introduce or investigate that evidence, it is significantly less likely that the jury would have found Karnezis's testimony sufficiently credible to convict Ms. Hockridge beyond a reasonable doubt on the sole count on which it returned a guilty verdict.

### C.  At the Very Least, the Cumulative Effect of the Withheld Evidence on the Government's Case Establishes Its Materiality

Even if any part of the withheld evidence were insufficient alone to be material, considered **together**, the withheld evidence comfortably satisfies *Brady*'s materiality standard. As the Fifth Circuit has explained, undisclosed evidence must be considered in light of its cumulative effect to assess its "potential impact on the outcome of the trial." *United States v. Sipe*, 388 F.3d 471, 491 (5th Cir. 2004). A defendant need not show that the Government failed to present "*sufficient* evidence to support a finding of guilt," *id.* (emphasis added), as evidence from which a guilty verdict could be rendered might also leave room for reasonable doubt. Here, there is at least a reasonable probability that the withheld evidence would have so weakened the Government's case under Count One that the jury would not have returned a guilty verdict on the sole count of conviction, but instead acquitted Ms. Hockridge, as it did on the other counts of the Superseding Indictment.

In *Sipe*, the defendant was a border patrol agent who was indicted for using excessive force during an arrest. 388 F.3d at 478. But "the Presentence Report became a source of controversy

21

when it became apparent that the government had disclosed information to the probation officer that it did not disclose to the defense." *Id.* at 475. While the Government's key witness at trial—a former colleague of the defendant—had testified to the grand jury that while he "d[idn't] get along with [the defendant] that well, he did "[n]ot . . . dislike" the defendant, a prosecution memorandum had memorialized a pretrial conversation with the witness in which he had "admit[ted] to disliking [the defendant] even before" the alleged use of excessive force. *Id.* at 480–81. Moreover, the Government had "failed to produce information regarding" the witness's several "brushes with the law," including an acquitted charge of falsifying a police report and a deferred adjudication for misdemeanor theft. *Id.* at 484–85. The Government had also failed to provide the defense "with a complete description of the benefits accorded" other testifying witnesses (all of whom had entered the United States illegally), including living expenses and travel authorizations pending the defendant's trial. *Id.* at 488.[10]

Both the trial court and the Fifth Circuit agreed that this evidence, taken cumulatively, was material under *Brady* and warranted a new trial. *Id.* at 491. Even though the individual pieces of evidence were either relatively minor discrepancies or were cumulative of other impeachment evidence (the Government had already disclosed, for example, that its immigrant witnesses had been given work authorizations pending their testimony), the Fifth Circuit considered the "potential impact on the outcome of the trial" to be "too strong" to discount. *Id.* Finally, the Fifth Circuit alternatively noted that even if a new trial were not ***required*** under *Brady*, there was sufficient doubt introduced by the undisclosed evidence to "convince[] the district court that [the defendant] did not receive a fair trial" and was entitled to a new one. *Id.*

---

[10]  Several other "minor" pieces of evidence were not disclosed but not deemed to be *Brady* violations because they were not clearly favorable to the defense and could have been discovered by the defense. *Sipe*, 388 F.3d at 491. Neither such qualification of the *Brady* doctrine applies here.

Here, the weight of the newly disclosed evidence is substantially greater than in *Sipe*. Much of the evidence in *Sipe* was merely cumulative impeachment evidence that would have allowed the defense to drive home points they could have made with evidence that had already been timely disclosed by the Government. Other evidence was relatively minor: a slight discrepancy between "didn't get along with" and "disliked," for example. Here, however, Ms. Hockridge now has access to substantial evidence that undermines the multiple elements of the Government's case against her, drawn from pretrial interviews of three previously undisclosed material witnesses. She also has access to impeachment evidence against Karnezis on key grounds for which she was previously unable to impeach him—grounds that sever the ties Karnezis painted between himself and Ms. Hockridge at trial. In short, this evidence "would have allowed [Ms. Hockridge] to attack the government's case from every angle," *id.* at 491, and "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435). Thus, the evidence is material, and *Brady* requires that Ms. Hockridge be given a new trial.

## III. The Government's Violation of *Brady*, in Combination with Other Trial Errors, Warrants a New Trial in the Interest of Justice

As in *Sipe*, even if the Government's wrongful withholding of favorable material evidence were not enough on its own to require a new trial, Ms. Hockridge has also raised several other substantial issues that, viewed together, show that a new trial is necessary in the interest of justice under Rule 33. A "defendant's 'substantial rights' [can be] harmed" by "the cumulative effect of *multiple* errors" that undermine the fairness of the trial as a whole. *United States v. Jindal*, 621 F. Supp. 3d 727, 735 (E.D. Tex. 2022) (emphasis added) (citing *United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015)). While the Government's violation of *Brady* is sufficient, standing alone,

to show that the Government has prejudicially violated Ms. Hockridge's right to a fair trial, that conclusion is inescapable in light of the numerous other flaws in the Government's prosecution.

First, consider the bolstering effect of the newly withheld evidence upon the Court's decision not to provide numerous jury instructions that Ms. Hockridge requested. *Cf.* Mem. ISO Mot. for New Trial (Doc. #269) at 18–24. If the Court had instructed the jury, as Ms. Hockridge requested, that they could only convict Ms. Hockridge of conspiracy if they unanimously agreed as to the particular conspiracy charged in the indictment, and if they had learned from the withheld evidence that Karnezis was part of an entirely separate conspiracy from that alleged in Count One, then the jury may very well have hung or acquitted on Count One. The Government's failure to make required disclosures thus reinforces the impact of instructional errors previously identified by Ms. Hockridge.

Second, consider the Court's initial exclusion of substantial evidence that Ms. Hockridge took efforts to detect and prevent fraud at VIPPP. *Cf.* Mem. ISO Mot. for New Trial (Doc. #269) at 25–33. Ms. Hockridge proffered numerous exhibits that impeached Karnezis's credibility, motives, and bias, but those documents were excluded when Karnezis was on the stand. Later, the Court rightfully recognized that these documents should have been admitted, and it allowed Ms. Hockridge to introduce some of those documents into evidence and show them to the jury in closing. But by that time, the damage had already been done—Karnezis was off the stand, and Ms. Hockridge was not able to cross-examine him with the exculpatory communications he had had with her. Although the denial of that opportunity was highly prejudicial, Karnezis had provided testimony at trial that allowed him to explain away the exculpatory communications as Ms. Hockridge keeping a "clean paper trail." The withheld evidence, which would have allowed Ms.

24

Hockridge to impeach Karnezis's coverup story, would have multiplied the effect of the exculpatory evidence that was improperly excluded.

The foregoing examples are illustrative, not exhaustive. But they show the snowball effect of errors in Ms. Hockridge's trial that, taken together, undermine the "fairness of the trial." *United States v. McRae*, 795 F.3d 471, 481 (5th Cir. 2015). But it is not too late; the errors are not beyond this Court's power to correct. Especially given the added prejudice resulting from the Government's unexplained failure to disclose *Brady* materials that Ms. Hockridge could have used to support her defense, the Court should conclude that the interest of justice justifies granting new trial.

CONCLUSION

During closing argument and throughout the trial, Ms. Hockridge told the jury that the Government had failed to present the full context of the case. The jury was convinced enough by Ms. Hockridge's argument that it acquitted her of four of the five charges against her. Yet now, the recent disclosures establish that the Government not only failed to provide full context to the jury, but materially deprived ***Ms. Hockridge*** of the ability to do so by withholding favorable evidence that was material to her defense. The interest of justice, the Constitution, and Ms. Hockridge's fundamental right to a fair trial all require more. Ms. Hockridge therefore respectfully requests that the Court vacate the jury's verdict and grant her a new trial on Count One of the Superseding Indictment.

Dated: November 6, 2025

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN
MARK A. SRERE
KEVIN H. JENCO
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bclplaw.com*
*mark.srere@bclplaw.com*
*kevin.jenco@bclplaw.com*

*Attorneys for Defendant Stephanie Hockridge*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2025, a true and correct copy of the foregoing document was served on all counsel of record by operation of the Court's CM/ECF system.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN